**Glenn L. ATCHLEY, et al., Plaintiffs–Appellants,**

v.

**HERITAGE CABLE VISION ASSOCIATES, a limited partnership, d/b/a TCI of Michiana, Defendant–Appellee.**

No. 96–1526.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 11, 1996.

Decided Nov. 26, 1996.

---

determined that Dr. Alexander was an independent contractor even though he did not supply his own equipment or assistants, he was required to spend a certain amount of time "on call," and he was assigned most of his operating room patients by the hospital's anesthesiology section head on a daily basis.

William R. Groth (argued), Fillenwarth, Dennerline, Groth & Towe, Indianapolis, IN, for Plaintiffs–Appellants.

Timothy W. Woods, Jones, Obenchain, Ford, Pankow, Lewis & Woods, South Bend, IN, Eric P. Simon (argued), Kreitzman, Motensen & Simon, New York City, for Defendant–Appellee.

Before COFFEY, RIPPLE, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Heritage Cable Vision Associates, a limited partnership, runs TCI of Michiana, a cable television system in northern Indiana. Local 1393 of the International Brotherhood of Electrical Workers, AFL–CIO, is the exclusive collective bargaining representative for installers and technicians employed by TCI at its Elkhart, Mishawaka, and Rochester, Indiana, facilities. Glenn Atchley and the remaining 67 individual plaintiffs in this case are installers and technicians represented by Local 1393 and employed by TCI at those locations. We'll refer to all the plaintiffs, collectively, as Local 1393.

From August until November 1994, Local 1393 and TCI negotiated over a new collective bargaining agreement. On November 28, 1994, TCI presented Local 1393 with a final offer, which included a wage hike of 40 cents per hour for employees who were members of the bargaining unit on the date of ratification. The offer, eventually memorialized as Article 7(B) in the finalized collective bargaining agreement ("CBA"), read:

> All employees in unit as of the date of ratification, shall receive an across-the-board increase of 40¢ per hour effective the first payroll period following ratification and on 9/16/95, except that employees hired between 9/16/94 and date of ratification, inclusive, shall receive a 40¢ per hour increase upon conclusion of their probationary period and on 9/16/95.

In addition, TCI orally agreed to pay a $100 ratification bonus to each employee who was a member of the bargaining unit on the date of ratification.

The members of Local 1393 ratified TCI's final offer on December 8, 1994, and on the next day Local 1393 informed TCI of the ratification. TCI's counsel sent Local 1393 a draft contract for review, with a cover letter stating that "[a]s soon as the document is finalized and executed by the Union, TCI will process the wage increases and ratification bonus of $100.00, less applicable payroll taxes."

The first pay period following ratification began December 10, 1994. On December 19, 1994, Local 1393 demanded that TCI pay the wage increases and ratification bonuses. Neither were included in the paychecks issued on December 23 for the pay period beginning December 10.

Article 4 of the CBA, as both ratified and signed, contains a three-step grievance procedure: (1) presentation of the grievance to the immediate supervisor; (2) if not satisfactorily resolved in step 1, presentment to the general manager and/or the director of engineering; and (3) if still not satisfactorily resolved, submission within 30 days to the American Arbitration Association for binding arbitration.

On January 9, 1995, union steward Thomas Myers filed a grievance alleging that TCI failed to pay the wage increases and bonuses as agreed between the parties in the ratified proposal. The remedy sought was "10% per day interest on all wages and bonus money not paid as agreed." Although the grievance was denied, TCI decided not to wait for execution of the formal CBA and on January 20, 1995, it paid the wage increases, retroactive to December 10, 1994. Myers advanced the grievance to step 2 of the grievance procedure on January 23, 1995. Again, it was denied. The union did not advance the grievance to the final step, binding arbitration.

TCI signed the final draft of the CBA on January 23, 1995, and Local 1393 executed the agreement on February 6, 1995. The CBA ran from the date of ratification, December 8, 1994, through September 15, 1996.

TCI paid the ratification bonuses on February 10, 1995. The parties agree that the amounts finally paid by TCI for the retroactive wage increases and bonuses were correct. But the matter was not ready to be put to bed as the union had a statute up its sleeve, Indiana Code §§ 22–2–5–1 and 22–2–5–2, the Indiana wage payment law. The

statute provides that if an employer fails to pay wages due within 10 days he shall,

> as liquidated damages for such failure, pay to such employee for each day that the amount due to him remains unpaid ten percent (10%) of the amount due to him in addition thereto, not exceeding double the amount of wages due, and said damages may be recovered in any court having jurisdiction of a suit to recover the amount due to such employee, and in any suit so brought to recover said wages or the liquidated damages for nonpayment thereof, or both, the court shall tax and assess as costs in said case a reasonable fee for the plaintiff's attorney or attorneys.

Local 1393 sued TCI in St. Joseph County, Indiana, circuit court, alleging that despite the requirements of the CBA, TCI failed to pay the wage increases within 10 days of the date earned, in violation of the Indiana code. TCI requested double the amounts belatedly paid as liquidated damages plus reasonable attorneys fees and costs.

TCI removed the case to the federal court in northern Indiana, claiming preemption of the issue by § 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). Once in the federal forum, the company filed a motion to dismiss for failure to exhaust the CBA's arbitration remedies. Local 1393 filed a motion to remand, which Judge Robert L. Miller, Jr. denied. Later, Judge Miller denied the local's motion for rehearing and granted TCI's motion to dismiss. The union and its members appeal.

Under 28 U.S.C. § 1441(b), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States...." One category of cases eligible for removal is "federal question" cases—that is, those cases "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

■ To determine whether federal question jurisdiction exists, we must examine the plaintiff's well-pleaded complaint to see if it raises an issue of federal law. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987); *Rice v. Panchal*, 65 F.3d 637, 639 (7th Cir.1995). Federal issues that arise solely as a *defense* to a state law action (sometimes called "conflict preemption") do not confer federal question jurisdiction. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393, 107 S.Ct. 2425, 2430, 96 L.Ed.2d 318 (1987); *Rice*, 65 F.3d at 639. Ordinarily, federal preemption is raised as a defense to the allegations in a complaint. *Caterpillar*, 482 U.S. at 392, 107 S.Ct. at 2430.

The "complete preemption" doctrine is the well-known exception to the well-pleaded complaint and conflict preemption rules, however. *See Metropolitan Life*, 481 U.S. at 63, 107 S.Ct. at 1546; *Caterpillar*, 482 U.S. at 393, 107 S.Ct. at 2430. Congress may so completely preempt a particular area that any complaint raising claims in that area is necessarily federal in character. *Metropolitan Life*, 481 U.S. at 63–64, 107 S.Ct. at 1546. To the extent that Congress has completely displaced a state law claim with federal law, a plaintiff's attempt to allege the state law claim properly is characterized from its inception as a complaint arising under the federal law. *Caterpillar*, 482 U.S. at 393, 107 S.Ct. at 2430; *Douglas v. American Info. Technologies Corp.*, 877 F.2d 565, 569 (7th Cir.1989).

■ Section 301 of the LMRA, which provides that suits for violation of contracts between an employer and a labor organization confer original jurisdiction in federal district courts, has complete preemption force. *Caterpillar*, 482 U.S. at 393, 107 S.Ct. at 2430. To ensure uniform interpretation of collective bargaining agreements, § 301 requires that federal rules of law be applied. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 403, 108 S.Ct. 1877, 1880, 100 L.Ed.2d 410 (1988); *Loewen Group Int'l, Inc. v. Haberichter*, 65 F.3d 1417, 1421 (7th Cir. 1995). Even if a plaintiff makes no mention of § 301 in a complaint, § 301 nevertheless may displace entirely a state cause of action, allowing removal by the defendant under the complete preemption exception to the well-pleaded complaint rule.

Section 301 preempts claims directly founded on or "substantially dependent on analysis of a collective-bargaining agreement." *Caterpillar*, 482 U.S. at 394, 107

S.Ct. at 2431 (quoting *International Bhd. of Elec. Workers v. Hechler,* 481 U.S. 851, 859 n. 3, 107 S.Ct. 2161, 2167 n. 3, 95 L.Ed.2d 791 (1987)); *Loewen,* 65 F.3d at 1421. When the "heart of the [state law] complaint [is] a . . . clause in the collective bargaining agreement, that complaint arises under federal law." *Caterpillar,* 482 U.S. at 394, 107 S.Ct. at 2430 (quoting *Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists and Aerospace Workers,* 390 U.S. 557, 558, 88 S.Ct. 1235, 1236, 20 L.Ed.2d 126 (1968)). If the resolution of a state law claim depends on the meaning of, or requires the interpretation of, a collective bargaining agreement, the application of state law is preempted and federal labor law principles must be employed to resolve the dispute. *Lingle,* 486 U.S. at 405–06, 407, 409–10, 413, 108 S.Ct. at 1881, 1882, 1883, 1885; *Loewen,* 65 F.3d at 1421. Even if explicit terms of the collective bargaining agreement may not be on point, it is a matter of federal contract interpretation whether the words of a collective bargaining agreement create implied rights. *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 215, 105 S.Ct. 1904, 1913, 85 L.Ed.2d 206 (1985); *Douglas,* 877 F.2d at 573. In sum, if it is necessary to interpret express or implied terms of a CBA, a state law claim is completely preempted by § 301, the claim is deemed federal in nature from its inception, and the complaint is deemed one that a defendant can remove.

■ Although the preemptive effect of § 301 is broad, preemption does not occur in every situation where a collective bargaining agreement comes into play. *Loewen,* 65 F.3d at 1421. "[N]ot every dispute concerning employment, or tangentially involving a provision of a collective bargaining agreement, is pre-empted by § 301 or other provisions of the federal labor law." *Allis–Chalmers,* 471 U.S. at 211, 105 S.Ct. at 1911; *Loewen,* 65 F.3d at 1421. For instance, § 301 says nothing about the substantive rights a state may provide to its workers when adjudication of those rights does not involve the interpretation of a collective bargaining agreement. *Lingle,* 486 U.S. at 409–10, 108 S.Ct. at 1883. "[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Livadas v. Bradshaw,* 512 U.S. 107, ——, 114 S.Ct. 2068, 2078, 129 L.Ed.2d 93 (1994). Instead, as we have noted, preemption is found when a provision of the collective bargaining agreement is the subject of the dispute or the dispute is substantially dependent upon an analysis of the terms of the collective bargaining agreement. *Loewen,* 65 F.3d at 1423.

■■ Local 1393 argues that any federal question presented in this case arises solely as a defense to the complaint; thus, under the conflict preemption rule, no federal question jurisdiction exists and the case must be remanded to state court. The local makes much of the argument that because federal labor law creates no remedy for the late payment of compensation, the Indiana statute we mentioned has not been "replaced," and unless such a federal remedy replaces the state law, the implications of federal law will arise only as a defense to the state law action.[1] Local 1393 also argues that the Indiana wage payment statute confers non-negotiable state-law rights on employers or employees independent of any right established by the CBA, which, as discussed in *Allis–Chalmers,* 471 U.S. at 213, 215, 105 S.Ct. at 1912, 1913, are not preempted by § 301.

Judge Miller in the district court believed that the CBA required interpretation, not mere reference, to determine when the wage increases and bonuses were to be implemented and paid. He reasoned that only after interpretation of the CBA to determine when the obligation to pay the wage increases and bonuses arose would it be possible to determine whether TCI violated the statute. Judge Miller believed these determinations involved more than a mere factual inquiry and instead depended on and required interpretation of article 7 of the CBA. The state law claim, he concluded, therefore was preempted by § 301, thus conferring subject matter jurisdiction on the district court.

---

1. That type of argument has been rejected repeatedly. *See Rice,* 65 F.3d at 640. Preemption law is clear on the point that § 301 may *dis*place state claims regardless of whether such claims are *re*placed with similar federal rights. *See id.*

We agree with TCI and Judge Miller that the claim made by Local 1393 requires interpretation of the CBA and that it is completely preempted by § 301. Indiana Code § 22–2–5–1 is a penal statute that is concerned with the timing of the payment of wages. *Fardy v. Physicians Health Rehabilitation Services, Inc.,* 529 N.E.2d 879, 881 (Ind.App. 1988). To decide this claim under §§ 22–2–5–1 and 22–2–5–2, we must determine the date on which TCI was required to pay the wage increases and bonuses. To determine that trigger date, we must look to the CBA, which properly governs the amount, method, and timing of payment of the bonuses and the increase in wages to the members of the bargaining unit.

■ The basic elements of the claim for the penalties must be gleaned from the CBA. Article 7(B) is the source of the wage increase and requires interpretation, not simply reference, to determine when the local and the company agreed to the payment of the increase. Although not included in the formal, written CBA, the payment of the ratification bonuses occurred through an oral collective bargaining agreement between TCI as employer and Local 1393 as bargaining agent. That verbal agreement also must be interpreted to determine when the parties agreed that payment of the bonuses would be made.[2] Even though the date of payment may not be set forth explicitly in article 7, just as it was in the *Allis–Chalmers* case, it is a question of federal contract interpretation whether there was an obligation under the CBA to provide the payments at a certain time and, if so, whether the employer breached that implied contract provision. *See Allis–Chalmers,* 471 U.S. at 215, 105 S.Ct. at 1913. Quite simply, the timing of payment of the wage increases and bonuses is a function of the CBA, and whether the members of Local 1393 were paid properly under the CBA requires interpretation of the CBA itself. Because the CBA must be interpreted, and because the claim of the local depends on the meaning of and is substantially dependent on analysis of the CBA, the claim, even though dressed in state-law clothing, is a federal § 301 claim. Federal question subject matter jurisdiction thus existed through the complete preemptive power of § 301, and removal was proper.

A comparison of this case to *Livadas* indicates that our decision is correct. *Livadas* involved a California statute requiring an employer, upon an employee's discharge, to pay immediately all wages due the employee. For violation of the rule, the statute imposed a penalty equal to a day's wages for each day that the payment was late. *Livadas* was discharged and demanded immediate payment of wages owed her. The employer refused, referring to a company practice of mailing such payments from a central payroll office. *Livadas* received her check three days later and, like the employees here, did not disagree with the amount paid as wages. She nevertheless filed a claim to recover three-days' worth of penalty. *Livadas,* 512 U.S. at ——————, 114 S.Ct. at 2071–72.

The Supreme Court determined that Livadas's claim for recovery of the penalty did not involve any interpretation of the collective bargaining agreement and so was not preempted by § 301. According to the Court, the primary text for deciding whether Livadas was entitled to a penalty was not the collective bargaining agreement, but a calendar. Beyond the simple need to refer to bargained-for wage rates to compute the penalty, the collective bargaining agreement was irrelevant to the dispute. *Livadas,* 512 U.S. at ——, 114 S.Ct. at 2079.

The claim by Local 1393 requires substantially more than the mere reference to the collective bargaining agreement in *Livadas.* In *Livadas,* the date from which penalties began was discernible simply from relating the date of her termination to the calendar date. In our case, the date from which penalties would run—i.e., the date 10 days after the date on which the increases and bonuses should have been paid—is unclear without interpretation of the explicit and implied terms of the CBA to determine when the

---

**2.** A collective bargaining agreement is not required to be reduced to writing. All that is required is conduct manifesting an intention to abide and be bound by certain terms. *Capitol–Husting Co. v. NLRB,* 671 F.2d 237, 243 (7th Cir.1982); *see Chicago & N.W. Transp. Co. v. Railway Labor Executives' Ass'n,* 908 F.2d 144, 156 (7th Cir.1990) (no general requirement that a collective bargaining agreement be in writing).

parties agreed that such payment was to be made.

The need for interpretation of the CBA to determine when the wage increases and bonuses should have been made is, it seems to us, acknowledged by Local 1393 in the complaint (emphasis added):

> 7. Despite their demands *and the requirements of the collective bargaining agreement*, Plaintiffs did not receive the $.40 per hour across-the-board wage increase until it was included in paychecks they received on or about January 20, 1995.
>
> 8. *Despite the agreement between Plaintiffs and Defendant*, Plaintiffs did not receive their One Hundred Dollar ($100.00) per employee signing bonus until it was included in paychecks they received on or about February 10, 1995.

The four corners of the complaint thus indicate that the heart of the claim arose from interpretation of the CBA and that the claim "substantially depended" upon the terms of the CBA.

Although the provisions of the Indiana wage payment statute are nonnegotiable, and *Allis–Chalmers* indicated that nonnegotiable state law rights providing minimum labor standards form the backdrop against which the LMRA was enacted, since deciding *Allis–Chalmers* the Supreme Court has recognized that

> [w]hile it may be true that most state laws that are not pre-empted by § 301 will grant nonnegotiable rights that are shared by all state workers, we note that neither condition ensures non-preemption. It is conceivable that a State could create a remedy that, although nonnegotiable, nonetheless turned on the interpretation of a collective-bargaining agreement for its application. Such a remedy would be pre-empted by § 301. Similarly, if a law applied to all state workers but required, at least in certain instances, collective-bargaining agreement interpretation, the application of the law in those instances would be preempted.

*Lingle*, 486 U.S. at 408 n. 7, 108 S.Ct. at 1882 n. 7. The present case is one of those situations contemplated by the *Lingle* Court where a state remedy, although nonnegotiable, turns on the interpretation of a collective bargaining agreement. The *Livadas* Court, we note, also made sure to mention that it was not saying that all California penalty claims would never be preempted by § 301. *Livadas*, 512 U.S. at ──── n. 19, 114 S.Ct. at 2079 n.19.

■ Because the claim of Local 1393 and its members arises under § 301, it is governed by federal substantive law. That law includes a strong preference for arbitration as a method for resolving labor disputes. *Mitchell v. Pepsi–Cola Bottlers, Inc.*, 772 F.2d 342, 347 (7th Cir.1985); *see Lingle*, 486 U.S. at 411, 108 S.Ct. at 1884 (need to preserve effectiveness of arbitration); *see also Allis–Chalmers*, 471 U.S. at 219, 105 S.Ct. at 1915 (arbitration holds central role in industrial self-government). Federal law governing § 301 claims also includes a general requirement that employees must exhaust grievance and arbitration remedies provided in a collective bargaining agreement before filing suit. *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 163, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476 (1983); *Smith v. Colgate–Palmolive Co.*, 943 F.2d 764, 771 (7th Cir.1991).

■ Because this lawsuit arose under § 301, it is considered a suit for breach of the CBA. "[I]f the [appellants'] claim, ostensibly based on state law, cannot be adjudicated without interpretation of the collective bargaining agreement, the claim turns into a federal claim that the agreement itself has been violated." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1180 (7th Cir.1993).

The CBA's own terms govern the resolution of disputes concerning breaches of the CBA. Article 4(A) of the CBA states:

> All complaints, disputes, controversies, differences or grievances by and between the Union and the Employer and/or between unit employees and the Employer, involving the interpretation, application or performance of this Agreement, which arise solely on or after the execution date but before the expiration date of this Agreement, shall be settled, determined,

502

adjusted and processed in accordance with the procedures set forth in this Article. Any and all disputes between the parties arising before the effective date of this Agreement or after the termination date thereof and/or any and all disputes based on facts, incidents or occurrences taking place prior to the effective date or subsequent to the termination date, are expressly excluded from coverage and are not in any way encompassed by this Article.

As we have mentioned, article 4 then sets forth a three step grievance procedure, with arbitration as the final step.

■ Article 4 creates some ambiguity, as it uses both "execution date" and "effective date" as if they were interchangeable, which they are not, leaving disputes arising between the effective date and execution date in limbo. Judge Miller, though, correctly pointed to the widespread federal law favoring arbitration to find that article 4 covered disputes arising after the effective date of December 8, 1994. We agree. We note that on appeal, Local 1393 does not press an argument regarding this ambiguity.

Because the state-law claim is really a claim between the union and its unit members on the one hand and the employer on the other involving the interpretation and performance of the CBA, article 4 required that the three step grievance procedure be followed. It was not. Although a grievance went to step 2, it never advanced to the final step, binding arbitration with the American Arbitration Association. The union therefore did not exhaust the required grievance procedures as required by federal law, and Judge Miller properly dismissed the claim.

Our opinion today does not mean that whenever a collective bargaining agreement exists interpretation of that agreement always will be required in connection with the Indiana wage payment statute and that the statute always will be preempted by § 301. But this particular collective bargaining agreement requires interpretation, putting it squarely within the completely preemptive effect of § 301 and transforming it into a federal claim for breach of the CBA, which had to be grieved pursuant to the CBA's grievance procedures.

The denial of the motion to remand and the grant of the motion to dismiss are AFFIRMED.

· We note as a matter of judicial housekeeping that our decision in *International Union, United Auto. Workers v. Hoosier Cardinal Corp.,* 346 F.2d 242 (7th Cir.1965), written long before *Allis–Chalmers, Lingle,* and *Livadas,* involved a union's claims under the predecessor of the Indiana wage payment statute. We rejected characterization of the claims as being brought under § 301 and instead described them as matters of state law, even though they arose from a collective bargaining agreement provision requiring vacation pay for the union's members. Our language in that case describing the union's claims for wages and statutory penalties as state law action was effectively overruled by the Supreme Court in *International Union, United Auto. Workers v. Hoosier Cardinal Corp.,* 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966), which affirmed the final outcome of our decision but recognized "at the outset that this action was properly brought by the union under § 301." Id. at 699, 86 S.Ct. at 1110. We also note the current invalidity of *Kosley v. Goldblatt Bros., Inc.,* 251 F.2d 558 (7th Cir.1958), which allowed an employee to pursue an Indiana state law claim against his employer for a statutory penalty for failure to pay accrued wages, even though the collective bargaining agreement between the employer and the union of which the employee was a member governed payment of wages and required disputes to be settled by arbitration. *Kosley* relied upon a holding of *Association of Westinghouse Salaried Employees v. Westinghouse Elec. Corp.,* 348 U.S. 437, 75 S.Ct. 489, 99 L.Ed. 510 (1955), that the Supreme Court later rejected. *See Smith v. Evening News Ass'n,* 371 U.S. 195, 198, 83 S.Ct. 267, 269, 9 L.Ed.2d 246 (1962) (the holding of *Westinghouse* "is no longer authoritative as a precedent").

AFFIRMED.