In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 19-3142

DANIEL SARAUER, et al.,

*Plaintiffs-Appellants*,

*v.*

INTERNATIONAL ASSOCIATION OF MACHINISTS
AND AEROSPACE WORKERS, DISTRICT NO. 10, et al.,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:16-cv-00361-DEJ — **David E. Jones**, *Magistrate Judge*.

_____

ARGUED APRIL 15, 2020 — DECIDED JULY 20, 2020

_____

Before MANION, HAMILTON, and BARRETT, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Private labor relations in this country are governed almost exclusively by federal law. This case is about the "almost." Under federal law, unions and employers may enter into collective bargaining agreements with "union security" clauses, which require employees either to become union members after being hired or, if they do not join, to pay fees to the union for representing them, as federal

law requires of the union. Congress has allowed states to take a different view of such clauses, however. More than half the states today have "right to work" laws prohibiting unions and employers from entering into union security agreements.

Wisconsin's Act 1 enacted in 2015 is a right-to-work law. Plaintiffs are ten Wisconsin employees who contend that Act 1 invalidated the union security clause in the 2015–2018 collective bargaining agreement between their employer and their bargaining unit's union, both defendants here. Plaintiffs filed this suit in a Wisconsin state court, and defendants removed to federal district court. The district court held that removal was proper because the case arises under federal law, not state law. The court then held as a matter of federal law that defendants' collective bargaining agreement was formed before Act 1 took effect so that plaintiffs are not entitled to relief. The court granted summary judgment for the defense. We affirm as to both jurisdiction and the merits.

I.   *Background*

The material facts are not disputed. Defendant Maysteel Industries is a sheet metal fabricator in Wisconsin. Maysteel employees are represented by defendant Machinists Union. Plaintiffs are ten employees of Maysteel who do not want to join the union and pay dues or even make fair-share payments. From March 2012 to March 2015, the company and the union were parties to a collective bargaining agreement that contained a union security clause. It required Maysteel employees as a condition of employment either to become union members or to pay a "service fee for representation" to the union. Under the agreement's dues check-off provision,

Maysteel, with an employee's authorization, deducted the union's dues or fees from the employee's paycheck and sent the money to the union.

In January 2015, the company and the union began negotiating a new collective bargaining agreement. Working from the 2012–2015 agreement as a baseline, the parties kept a written tally of proposed changes as they were agreed upon. By February 27 the new agreement had been fully negotiated except for the timing of breaks, a point on which the old agreement had been silent and which the new agreement provided would be settled by the parties by April without further contracting. On February 28 the new agreement (that is, the old agreement plus all agreed upon changes) was presented to the union membership for ratification. The membership ratified the new agreement the same day. The new agreement was to take effect on March 5, the day after the old agreement expired, but the parties agreed to implement it on March 2 to line up its new wage rates with the start of a new pay period. The new agreement was actually signed on March 18, a point that is at the heart of plaintiffs' claims, which depend on when the new agreement took effect.

On March 11, Wisconsin's Act 1 took effect. It applied "to a collective bargaining agreement containing provisions inconsistent with this act upon renewal, modification, or extension of the agreement occurring on or after" that date. 2015 Wis. Act 1 § 13. Three plaintiffs began objecting to the fee deductions and demanded that Maysteel stop them. These plaintiffs also demanded copies of their signed check-off authorizations. Neither the company nor the union was forthcoming. The three plaintiffs filed charges with the National Labor Relations Board complaining of unfair labor practices.

The Board negotiated a settlement of the charges that did not require reimbursement of the deductions or invalidation of the union security clause.

In 2016, plaintiffs then filed this lawsuit in a Wisconsin state court. The complaint alleged two claims for unfair labor practices under state law as amended by Act 1. It alleged that plaintiffs had been unlawfully required to pay union fair-share fees as a condition of employment in violation of Wis. Stat. § 111.04(3)(a). The complaint added a third claim for violation of the state wage payment statute, alleging on behalf of those plaintiffs whose written check-off authorizations could not be found (six at the time of filing, five after discovery in this case) that Maysteel had unlawfully withheld their wages without authorization.

Defendants removed the case to federal court. Plaintiffs moved to remand, arguing that they had pleaded only state law claims and could not be forced into the federal forum. Defendants countered that plaintiffs themselves had raised an issue of federal labor law (specifically, of labor contract formation) by alleging that defendants had "backdated" the new collective bargaining agreement to evade the new requirements of Act 1.

The parties consented to the jurisdiction of the magistrate judge under 28 U.S.C. § 636(c). The judge denied remand and later granted defendants' motion for summary judgment. The court held that as a matter of federal law, the new collective bargaining agreement had not been renewed, modified, or extended on or after the effective date of Act 1. The union security clause of the new agreement was therefore valid. The district court held further that plaintiffs' wage payment claims were within the exclusive jurisdiction of the National Labor

Relations Board. We have jurisdiction over plaintiffs' appeal from that final judgment. 28 U.S.C. § 1291.

II. *Analysis*

Plaintiffs appeal both the district court's denial of their motion to remand to state court and the grant of summary judgment to defendants. Plaintiffs also ask us to certify questions of Wisconsin law to the Wisconsin Supreme Court under Circuit Rule 52. We conclude that the district court correctly denied remand and granted summary judgment. Also, there is no controlling issue of state law to certify.

A. *Federal Jurisdiction*

We review de novo the district court's denial of a motion to remand. *Schur v. L.A. Weight Loss Centers*, 577 F.3d 752, 758 (7th Cir. 2009). A motion to remand must be granted if the case removed from state court could not have been brought in federal court originally for lack of subject-matter jurisdiction. 28 U.S.C. §§ 1441(a), 1447(c). Jurisdiction in this case is based on the district court's jurisdiction over actions "arising under" federal law. § 1331. Plaintiffs argue that they assert rights only under state law, but two paths may support "arising under" federal jurisdiction over such claims here: so-called "complete" preemption and an "embedded" federal question. The district court took the complete preemption path, holding principally that this case necessarily arises under § 301 of the Labor Management Relations (Taft–Hartley) Act of 1947, 29 U.S.C. § 185. We agree with the district court's ultimate conclusion that it had jurisdiction and with much of its reasoning. We do not follow the significant expansion of § 301

arguably implied by the district court's ruling and instead follow the "embedded question" path.[1]

### 1. *Complete Preemption?*

For purposes of 28 U.S.C. § 1331, a case generally "arises under" the law that creates the plaintiff's cause of action. *Franchise Tax Board v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 8–9 (1983). As a result, a state law claim ordinarily cannot be removed, even if it is necessarily defeated by a federal defense, because the federal question supporting jurisdiction must appear on the face of the plaintiff's properly or

---

[1] It may be helpful to clarify our terms. Our cases occasionally refer to "complete" and "field" preemption interchangeably, see, e.g., *Boomer v. AT&T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002) ("the doctrine of field (also known as complete) preemption"), or suggest there is an essential connection between them. See *Lehmann v. Brown*, 230 F.3d 916, 919 (7th Cir. 2000) ("'complete preemption' is a misnomer, having nothing to do with preemption and everything to do with federal occupation of a field"). There is, however, a difference that is helpful to keep in mind. We have distinguished complete preemption, which is a jurisdictional doctrine permitting removal, from "ordinary," defensive preemption as a matter of the applicable substantive federal law that does not provide a basis for federal jurisdiction. See, e.g., *Smart v. Local 702 IBEW*, 562 F.3d 798, 803–04 (7th Cir. 2009) ("A logical first step in [the complete preemption] analysis is determining whether the state claim is displaced by federal law under an ordinary preemption analysis."); see also 14C Charles Alan Wright and Arthur R. Miller et al., *Federal Practice and Procedure* § 3722.2 (4th ed. 1998 & supp. 2020) ("In recent years, federal courts have drawn an important distinction between what have come to be called the 'complete' preemption and the 'ordinary' preemption by federal law of a claim that appears to be based on state law."). In this opinion we use "complete" preemption to refer to the doctrine that supports federal jurisdiction over claims seemingly framed as state law claims. That is the term used by the Supreme Court in discussing removability on the basis of federal labor law. See *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987).

"well-pleaded" complaint. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392–93 (1987). Congressional intent to prohibit a state law cause of action is thus not sufficient to create federal subject-matter jurisdiction. *Franchise Tax Board*, 463 U.S. at 12. But congressional intent to displace a state law cause of action—such that there is "no such thing as a state-law claim" for violation of the right asserted, *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 11 (2003), only a federal one—is sufficient to create jurisdiction. *Franchise Tax Board*, 463 U.S. at 23. The state law claim is then said to be "completely pre-empted" and "is considered, from its inception, a federal claim." *Williams*, 482 U.S. at 393.

Only a small number of federal statutes have completely preemptive effect. See *Retail Property Trust v. United Brotherhood of Carpenters and Joiners of Am.*, 768 F.3d 938, 946–49 & n.5 (9th Cir. 2014). First among them is § 301 of the Taft–Hartley Act. *Williams*, 482 U.S. at 393–94 (complete preemption was first recognized and "applied primarily" in context of § 301); *Avco Corp. v. Aero Lodge No. 735*, 390 U.S. 557, 560 (1968) (first recognizing complete preemption under § 301). That statute supplies the exclusive cause of action for all claims, no matter how denominated, having a sufficiently close connection to a collective bargaining agreement governed by federal law. *Williams*, 482 U.S. at 393–94; *Baker v. Kingsley*, 387 F.3d 649, 657 (7th Cir. 2004).

### a. *§ 301 of the Taft–Hartley Act*

Section 301 is a multifaceted instrument of federal labor policy. Complete preemption is only one of its three faces. First, § 301 contains a narrow grant of subject-matter jurisdiction to district courts over suits "for violation" of collective bargaining agreements. *Textron Lycoming Reciprocating Engine Div. v. United Auto Workers*, 523 U.S. 653, 657 (1998) ("a suit

'for violation of a contract'… is one filed *because a contract has been violated*"). Second, as a consequence of the first, § 301 broadly authorizes federal courts to develop a common law of labor contracts to be applied exclusively in both state and federal court. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 209 (1985) (§ 301 is "a congressional mandate to the federal courts to fashion a body of federal common law"); *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103 (1962) ("substantive principles of federal labor law must be paramount in the area covered by" § 301). Third, as a consequence of the second, § 301 completely preempts state law claims "founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective-bargaining agreement." *Williams*, 482 U.S. at 394 (quotation marks omitted). In fewer words, "When the 'heart of the state law complaint is a clause in the collective bargaining agreement,'" the complaint necessarily arises under § 301. *Atchley v. Heritage Cable Vision Assocs.*, 101 F.3d 495, 499 (7th Cir. 1996) (brackets and ellipsis omitted), quoting *Williams*, 482 U.S. at 394.

The capacity of § 301 to displace state law claims dependent on collective bargaining agreements flows from the complete predominance of federal law in interpreting and enforcing those agreements. The "negotiation and administration" of labor contracts would be substantially impeded absent the certainty that is derived from exclusive application of uniform federal rules, *Lucas Flour*, 369 U.S. at 103–04, and that is protected by parties' ability to remove such cases to federal court. *Avco Corp.*, 390 U.S. at 560; see also *Baker*, 387 F.3d at 657 ("the federal statute will displace the state-law claim to ensure uniform interpretation of collective bargaining agreements"), citing *Atchley*, 101 F.3d at 498. But there is precisely one point of

labor contract law that is by congressional design *not* subject to a mandate of national uniformity: the enforceability of union security agreements under § 14(b) of the National Labor Relations or Wagner Act of 1935, as amended by the Taft–Hartley Act, 29 U.S.C. § 164(b).

### b.  *§ 14(b) of the Wagner Act*

Section 8(a)(3) of the Wagner Act permits unions and employers to negotiate for "union shop" and "agency shop" agreements under specified conditions while prohibiting "closed shop" agreements as an unfair labor practice. See 29 U.S.C. § 158(a)(3); *Oil, Chem. and Atomic Workers Int'l Union v. Mobil Oil Corp.*, 426 U.S. 407, 409 n.1 (1976) (distinguishing treatment of union, agency, and closed shops under § 8(a)(3)). As amended by the Taft–Hartley Act, § 14(b) expressly deprives § 8(a)(3) of any preemptive force in its permissive aspect:

> Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

29 U.S.C. § 164(b).

We have construed "agreements requiring membership in a labor organization" to mean agreements requiring the payment of money to a labor organization, encompassing all forms of union security agreements. *Sweeney v. Pence*, 767 F.3d 654, 661 (7th Cir. 2014). As to all such agreements, therefore, Congress "chose to abandon any search for uniformity" and

"decided to suffer a medley of attitudes and philosophies on the subject." *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 375 U.S. 96, 104–05 (1963).

As the federal interest served by complete preemption wanes over state laws within § 14(b), the state interest subordinated by it waxes. *Schermerhorn* held that an action to enforce Florida's right-to-work law did not allege an arguable unfair labor practice within the exclusive jurisdiction of the National Labor Relations Board under the broad and distinct preemption doctrine called *Garmon* preemption. *Schermerhorn*, 375 U.S. at 103–04, declining to apply *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959). On the Supreme Court's reading of § 14(b), Congress could not have intended to grant the states "overriding authority" to pass laws prohibiting union security agreements while withholding from them "the power to enforce those laws." *Id.* at 102–03.

c.  *Interpreting Defendants' Union Security Clause*

In this case, plaintiffs alleged that the company and the union subjected them to unfair labor practices and wrongfully withheld their wages in violation of Wisconsin law. The heart of plaintiffs' complaint was a clause in the collective bargaining agreement: the union security clause. If that clause required Maysteel employees to "Pay any dues, fees, assessments, or other charges or expenses of any kind or amount, or provide anything of value, to a labor organization" as a condition of employment, Wis. Stat. § 111.04(3)(a), then defendants engaged in unfair labor practices and wrongfully withheld wages. See *id.* §§ 111.04(3)(b), 111.06(1)(a), 109.03(1).[2] If it

---

[2] This was the characterization of plaintiffs' wage payment claims adopted by the district court. Plaintiffs dispute it on appeal. We assume

did not, they did not. In recognition of this fact, plaintiffs three times pleaded a "real, actual and justiciable controversy … as to the Plaintiffs' and the Defendants' rights and obligations under" defendants' collective bargaining agreement. In any other context, these allegations about the collective bargaining agreement would establish complete preemption under § 301.

But this context is different. First, uniquely when applying state right-to-work laws, there is no federal reason why even identical union security clauses need to be interpreted uniformly in different states. States are free to prohibit as much or as little as they will when it comes to union security agreements as long as they stay within the bounds set by § 14(b). See, e.g., *Oil Workers*, 426 U.S. at 414 (application of Texas law fell outside § 14(b)); *Sweeney*, 767 F.3d at 661 (application of Indiana law fell within § 14(b)). Second, as with *Garmon* preemption, see *Sears, Roebuck & Co. v. San Diego Cty. Dist. Council of Carpenters*, 436 U.S. 180, 192 (1978), complete preemption under § 301 deprives the plaintiff not only of a state forum but also of state remedies. Claims completely preempted under § 301 are remitted first of all to the remedial scheme (usually arbitration) provided by the collective bargaining agreement. See, e.g., *Lueck*, 471 U.S. at 220–21; *Atchley*, 101 F.3d at 501–02; *Brazinski v. Amoco Petrol. Additives Co.*, 6 F.3d 1176, 1179–81 (7th Cir. 1993). To find complete preemption of claims based on a union security clause allegedly prohibited by a state law within § 14(b) would thus, contrary to *Schermerhorn*, deny the states "the power to enforce" laws

_____

its correctness for the sake of this discussion and address the point more fully below.

Congress has expressly authorized them to make. 375 U.S. at 102.

> d.  *Determining the Time Defendants' Agreement Was Formed*

Defendants counter that the heart of plaintiffs' complaint depends on the law of § 301 in a second sense. They argue the complaint depends not so much on the meaning of a clause in a collective bargaining agreement as on the agreement's existence at a given point in time—the effective date of the Wisconsin Act 1. Specifically, if defendants' 2015–2018 collective bargaining agreement was not "renewed, modified, or extended" after March 10, 2015, the prohibitions of Act 1 did not apply to it. See 2015 Wis. Act 1 § 13 ("upon the renewal, modification, or extension of the agreement"). So plaintiffs' claim depends on a question that, as it happens, has long been recognized as being governed by a uniform rule of federal law. Deciding whether and when a collective bargaining agreement is formed and binding calls for a uniform federal rule. *Mohr v. Metro East Mfg. Co.*, 711 F.2d 69, 71 (7th Cir. 1983) ("the Supreme Court has opted for uniform rules for questions of [labor] contract formation").

Whether the federal interest in uniform contract formation rules under § 301 is enough, under the doctrine of complete preemption, to displace entirely Wisconsin's interest in enforcing the right-to-work provisions of Act 1 by the remedial scheme of its choice is a difficult question. We do not need to decide it here. We follow instead the district court's insight that appears in its opinion as an alternative or additional ground for removal and federal arising-under jurisdiction. The controlling importance of the contract formation question embedded in plaintiffs' claims evokes the "embedded federal

question" doctrine recognized by *Grable & Sons Metal Products., Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), among other cases.

Before turning to *Grable*, we note that *Oil Workers*, relied on by defendants, does not compel a different preemption analysis. In that case, the employer sued the union in federal court "under § 301" for a declaratory judgment that the union security provision in the parties' collective bargaining agreement violated Texas's right-to-work law. 426 U.S. at 410. The district court's jurisdiction went unquestioned in the Supreme Court's opinion. The Court has taught that such unquestioned assumptions of jurisdiction "have no precedential effect." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 91 (1998). Further, jurisdiction in *Oil Workers* could be explained equally well by the rule that the natural defendant to a hypothetical coercive suit may bring an action in federal court for declaratory relief if the natural plaintiff's suit would arise under federal law, see *NewPage Wis. Sys. Inc v. United Steel Workers*, 651 F.3d 775, 777–78 (7th Cir. 2011)—assuming it was imminent that the employer would be sued by the union in a coercive suit arising under § 301 for the employer's breach of the union security provision. Cf. *Textron*, 523 U.S. at 661. Either way, the silent assumption of jurisdiction in *Oil Workers* tells us nothing about complete preemption in this case. *Oil Workers* is not controlling.

## 2. *Embedded Federal Question*

The "creation test" first articulated in *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916) ("A suit arises under the law that creates the cause of action"), "accounts for the vast bulk of suits that arise under federal law." *Gunn v. Minton*, 568 U.S. 251, 257 (2013), citing *Franchise Tax*

*Board v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 9 (1983). For nearly a century, however, the Supreme Court has decided a "special and small category" of cases allowing jurisdiction where the plaintiff's claim arises under state law but depends upon an embedded question of federal law. *Gunn*, 568 U.S. at 258. See, e.g., *Grable & Sons Metal Prods., Inc. v. Darue Eng'g and Mfg.*, 545 U.S. 308 (2005); *Smith v. Kansas City Title & Trust Co.*, 225 U.S. 180 (1921). One of the enduring challenges in the law of federal jurisdiction is to navigate the boundary between this line of cases and the more general standards of arising-under law.

State law claims that are not displaced by federal law may still arise under federal law for purposes of § 1331 if they "implicate significant federal issues." *Grable*, 545 U.S. at 312. A plaintiff's complaint is said to present an "embedded" federal issue supporting federal-question jurisdiction if it raises a federal issue that is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. Plaintiffs' complaint in this case satisfied all four elements of this test.

### a. *Federal Issue*

The federal question at the heart of plaintiffs' complaint was, as they twice pleaded, whether "the Defendants' 2012 CBA was renewed, modified, [or] extended on or after March 11, 2015." This language was taken from Wisconsin's Act 1, leading plaintiffs to argue that it raises a question of only state law: whether the state statute applies to defendants' 2015–2018 collective bargaining agreement. The problem for plaintiffs is that that question necessarily asks when defendants' agreement became binding in all other respects, in whole (by

renewal or extension) or in part (by modification). That is a
question of federal labor law. Application of the state statute
must depend on this question of federal law if the state statu-
tory language is to serve its apparent purpose of avoiding an
unconstitutional impairment of contracts. See *Sweeney v.
Pence*, 767 F.3d 654, 666–67 (7th Cir. 2014).

Wisconsin is not entitled to give an independent answer to
this question, different from federal law. *Mohr v. Metro East
Mfg. Co.*, 711 F.2d 69, 71 (7th Cir. 1983) ("the Supreme Court
has opted for uniform rules for questions of [labor] contract
formation"); see also, e.g., *Operating Engineers Local 139 Health
Benefit Fund v. Gustafson Constr. Corp.*, 258 F.3d 645, 649 (7th
Cir. 2001); *Atchley v. Heritage Cable Vision Assocs.*, 101 F.3d 495,
500 n.2 (7th Cir. 1996). Wisconsin law could not give a differ-
ent answer on when a labor contract begins to bind the parties
without threatening the certainty and uniformity guaranteed
by § 301 of the Taft–Hartley Act. See *Local 174, Teamsters v. Lu-
cas Flour Co.*, 369 U.S. 95, 103–04 (1962). Federal law controls.

### b. *Necessarily Raised*

We proceed to *Grable*'s four-part test. First, the federal is-
sue in this case is necessarily raised on the face of plaintiffs'
complaint. Plaintiffs' claims for unfair labor practices and
wrongful wage withholding could succeed only if Act 1 inval-
idated defendants' union security clause.[3] And Act 1 invali-
dated defendants' union security clause only if defendants'
collective bargaining agreement was renewed, modified, or
extended after March 10, 2015. See *Gunn*, 568 U.S. at 259 ("To
prevail on his legal malpractice claim … Minton must show

---

[3] Regarding plaintiffs' wage withholding claims, see n.2, supra.

that he would have prevailed in his federal patent infringement case").

### c. *Actually Disputed*

Second, the federal issue is actually disputed. "[I]ndeed, on the merits, it is the central point of dispute." *Gunn*, 568 U.S. at 259. Plaintiffs said a collective bargaining agreement is renewed, modified, or extended (that is, formed) upon execution; defendants said it can be formed upon ratification. In fact, this is the only disputed question.

### d. *Substantial*

Third, the federal issue is substantial "in the relevant sense." *Gunn*, 568 U.S. at 260. The relevant sense of substantiality is not the importance of the federal issue to the lawsuit. "The substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal system as a whole." *Id.* In *Grable*, the substantial federal issue in a state action to quiet title was whether a federal agency's sale of the contested property had been valid under federal law. "The Government's 'direct interest in the availability of a federal forum to vindicate its own administrative action' made the question 'an important issue of federal law that sensibly belonged in a federal court.'" *Id.* at 260–61 (brackets omitted), quoting *Grable*, 545 U.S. at 315. In *Smith v. Kansas City Title & Trust Co.*, the substantial federal issue in a state shareholder suit was whether certain classes of federal bonds were void because issued under an unconstitutional federal statute. 225 U.S. 180, 195 (1921), discussed in *Gunn*, 568 U.S. at 261.

In this case, the importance of the contract formation issue to the federal system as a whole is the very reason federal law applies to begin with: the "negotiation and administration" of

collective bargaining agreements would be substantially impeded, contrary to federal labor policy, if employers doing business in Wisconsin could not be certain when their collective bargaining agreements become enforceable because two different legal regimes might apply. *Lucas Flour*, 369 U.S. at 103.

### e.  *Capable of Resolution Without Disruption*

Fourth and finally, the federal issue can be resolved in federal courts without disturbing the congressionally approved "balance of federal and state judicial responsibilities." *Gunn*, 568 U.S. at 264, quoting *Grable*, 545 U.S. at 314. Any claim sufficiently dependent on a collective bargaining agreement is removable, period, apart from § 14(b) of the Wagner Act. But state power under § 14(b) "begins only with actual negotiation and execution of the type of agreement described by § 14(b)." *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 375 U.S. 96, 105 (1963). That threshold issue is decisive in this case. And unlike complete preemption, removal under *Grable* does not displace state law or preclude state remedies; it leaves intact the states' legitimate enforcement interests under § 14(b). See *Schermerhorn*, 375 U.S. at 102. Removal here thus fits precisely the congressional division of labor.

### 3.  *Conclusion on Jurisdiction*

Plaintiffs' complaint was not completely preempted under § 301 only because it required interpretation of defendants' union security clause. Without deciding whether it was completely preempted because it required determining when defendants' collective bargaining agreement was formed, we conclude this federal issue was sufficient to support arising-under jurisdiction and removal under the embedded question

theory in the *Grable* line of cases. The district court properly denied remand to state court.

B. *Motion for Summary Judgment*

On the merits, we review de novo the district court's determination that there were no genuine disputes of material fact and defendants were entitled to judgment as a matter of law. *Riley v. City of Kokomo*, 909 F.3d 182, 187–88 (7th Cir. 2018); see Fed. R. Civ. P. 56(a). Here, we may be briefer. Wisconsin's Act 1 did not apply to defendants' 2015–2018 collective bargaining agreement because the agreement was not renewed, modified, or extended after March 10, 2015. To show the contrary, plaintiffs would need to point to some contractually significant event occurring after that date which effected a change in either the meaning or duration of the rights and obligations under the agreement. They have not done so.

1. *Unfair Labor Practice Claims*

Federal law allows a collective bargaining agreement to take effect before the parties have formally executed a written document. "All that is required" to make a collective bargaining agreement binding is "conduct manifesting an intention to abide and be bound by the terms of [the] agreement." *Bricklayers Local 21 of Ill. Apprenticeship and Training Program v. Banner Restoration, Inc.*, 385 F.3d 761, 766 (7th Cir. 2004) (alteration omitted), quoting *Gariup v. Birchler Ceiling & Interior Co.*, 777 F.2d 370, 373 (7th Cir. 1985), and citing *Operating Engineers Local 139 Health Benefit Fund v. Gustafson Constr. Corp.*, 258 F.3d 645, 650 (7th Cir. 2001), and *Atchley v. Heritage Cable Vision Assocs.*, 101 F.3d 495, 500 n.2 (7th Cir. 1996), among others. This rule is implicit in, if not mandated by, § 8(d) of the Wagner Act. See 29 U.S.C. § 158(d) (requiring "execution of a

written contract incorporating any agreement reached if requested by either party" as part of duty to bargain collectively). The parties may not even be able to contract around it. See *NLRB v. South Fla. Hotel & Motel Ass'n*, 751 F.2d 1571, 1581 n.14 (11th Cir. 1985) ("This clause [providing that the contract would become effective upon execution] notwithstanding, the Union and the Association created a valid and enforceable contract upon rank and file ratification.").

In this case, the union's February 28, 2015 ratification vote manifested its acceptance of the proposed agreement that had been concluded by the parties' negotiators the previous day. The ratification was "the last act necessary" to make the agreement binding. *Mack Trucks, Inc. v. United Auto Workers*, 856 F.2d 579, 592 (2d Cir. 1988). Plaintiffs point to no renegotiation of the agreement's terms between the date of ratification and the date of execution (March 18) or any other day on or after the effective date of Act 1 (March 11). The execution in itself did not add to or subtract from defendants' agreement. As between the parties, its terms had the same force and effect on March 19 as they had on March 17.

We agree with the district court that plaintiffs' heavy reliance on *Appalachian Shale Products Co.*, 121 N.L.R.B. 1160 (1958), is not persuasive. The National Labor Relations Board held in that case that an unsigned collective bargaining agreement did not bar a competing union's petition to represent the employer's employees. *Id.* at 1161–62. This was a specific application of the "contract bar rule," a discretionary procedure adopted by the Board for reconciling the Wagner Act's "goals of promoting industrial stability and employee freedom of choice" in the context of representation petitions. *NLRB v. Dominick's Finer Foods, Inc.*, 28 F.3d 678, 683 (7th Cir. 1994).

The *Appalachian Shale* rule represents the Board's judgment of how best to serve "the effectiveness of its contract bar policies." 121 N.L.R.B. at 1161. It says nothing about when a collective bargaining agreement begins to bind the parties to it.

We agree as well with the district court that plaintiffs do no better to rely on Board decisions applying the rule against retroactively enforcing union security clauses, see *Namm's Inc.*, 102 N.L.R.B. 466, 469 (1953), overruled on other grounds, *Kaiser Steel Corp.*, 125 N.L.R.B. 1039, 1041 n.2 (1959), or the exemption from the prohibition on closed shops for any collective bargaining agreement "entered into" before the Taft–Hartley Act's effective date unless "renewed or extended" afterward. See *United Hoisting Co.*, 92 N.L.R.B. 1642, 1643 n.2 (1951).

None of these decisions required execution of a written document to make a collective bargaining agreement binding. Decisions in the latter line proceeded from the unremarkable and uncontested assumption that execution is often a reliable marker of contract formation, but they did not hold that execution is required. See *United Hoisting Co.*, 92 N.L.R.B. at 1644; *Spiegel, Inc.*, 91 N.L.R.B. 647, 662 (1950); *Salant & Salant, Inc.*, 87 N.L.R.B. 215, 216–218 (1949).

Decisions in the retroactivity line prohibited unions from retroactively demanding dues or fees for any period before the collective bargaining agreement was *formed* even if new wage rates were made effective as of an earlier date. Plaintiffs note the Board's use of "execution" in *International Chemical Workers*: "It also is well established that the date of execution, not the effective date, of a collective-bargaining agreement governs the validity of such a [union security] clause." *International Chemical Workers, Local No. 112*, 237 N.L.R.B. 864, 865

(1978), citing *Local No. 25, Teamsters*, 220 N.L.R.B. 76, 77 (1975). The Board in that case referred to "execution" in distinguishing between contract formation and retroactive effective dates where no collective bargaining agreement had been in place for a time. The Board was not distinguishing between formation by ratification on one hand and formation by written execution on the other. The same was true in the cited *Local No. 25, Teamsters*. These retroactivity decisions simply did not address when labor contract *formation* happens. On that question, the Board continues to adhere to the rule we follow here, that offer and acceptance, not execution, make a labor contract. See, e.g., *YWCA of Western Mass.*, 349 N.L.R.B. 762, 763 & n.8 (2007).

Applying established law on contract formation, defendants' collective bargaining agreement here was thus formed upon ratification on February 28, 2015. Neither execution on March 18 nor any contractual event before or after disturbed its terms. Because defendants' agreement was thus not renewed, modified, or extended after March 10, Act 1 did not invalidate its union security clause. Defendants were entitled to judgment as a matter of law.

### 2. *Wage Payment Claim*

We noted above that the correct characterization of plaintiffs' wage payment claim is contested. See nn. 2–3, supra. The Wisconsin wage payment statute generally requires employers every month to pay "all wages earned by the employee to a day not more than 31 days prior to the date of payment." Wis. Stat. § 109.03(1). State law provides a private right of action to recover the amount of wages due and unpaid and up to double damages. § 109.11(2)(a)–(b). The statute does not apply to employees who are "covered under a valid collective

bargaining agreement establishing a different frequency for wage payments, including deferred payments exercised at the option of employees." § 109.03(1)(a).

In this case, plaintiffs complained that Maysteel wrongfully withheld the union's dues or fair share fees from their paychecks "without authorization." If that claim depended on holding invalid the union security term of the collective bargaining agreement—as the district court thought it did, at least in part—it failed because the union security clause was valid for the reasons explained above.

Any other framing of the claim is self-defeating, since it assumes the union was entitled to the fees deducted from plaintiffs' paychecks and leaves no room to recover wages that were "due" but "unpaid." Contra Wis. Stat. § 109.11(2)(a)–(b). And any other framing of the claim, though not depending on the embedded federal question supporting jurisdiction of the unfair labor practice claims, would be within the district court's sound and unchallenged assertion of supplemental jurisdiction. See 28 U.S.C. § 1367.

But we agree with the district court that the assertion of supplemental jurisdiction was redundant. Plaintiffs were "covered under a valid collective bargaining agreement establishing a different frequency for wage payments, including deferred payments exercised at the option of employees." Wis. Stat. § 109.03(1)(a). Plaintiffs therefore needed to invoke the collective bargaining agreement (either the old or the new agreement, depending on the claim). Construed as a claim for unauthorized deduction in violation of the agreement's check-off provision, plaintiffs' wage payment claim arose under § 301 and failed on the merits for failure to exhaust the agreed private remedies. See *Allis-Chalmers Corp. v. Lueck*,

471 U.S. 202, 220–21 (1985). Construed as based specifically on the employer's failure to keep records of plaintiffs' check-off authorizations while continuing to make deductions, the claim alleged an arguable unfair labor practice within the Board's exclusive jurisdiction under *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959); see 29 U.S.C. § 186(c). Plaintiffs basically conceded as much by filing unfair labor practice charges with the Board before bringing this lawsuit. And because the Board would not order the damages remedy sought by plaintiffs on these facts, see *Mode O'Day Co.*, 290 N.L.R.B. 1234, 1234 (1988) ("This approach results in the parties being placed in the posture they would have been in had no unfair labor practices occurred"), any state damages remedy was preempted. *Wisconsin Dep't of Industry v. Gould Inc.*, 475 U.S. 282, 286 (1986) ("the *Garmon* rule prevents States … from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by" the Wagner Act). That is so, anything in Act 1 or elsewhere in Wisconsin law notwithstanding. *Machinists District Ten v. Allen*, 904 F.3d 490, 503–07 (7th Cir. 2018). On any theory of the wage payment claim, therefore, dismissal was proper.

C. *Motion to Certify*

Under Circuit Rule 52, plaintiffs filed a motion asking us to certify two questions to the Wisconsin Supreme Court: whether Act 1 applies to defendants' collective bargaining agreement and whether Maysteel's dues check-offs without written records of authorization violated the Wisconsin wage payment statute. As explained above, state law does not control either question here. States are not authorized to regulate the formation of a collective bargaining agreement simply because it is alleged to contain a prohibited union security

clause. *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 375 U.S. 96, 105 (1963) (state power under § 14(b) "begins only with actual negotiation and execution of the type of agreement described by § 14(b)"). And whether Maysteel's dues check-offs were "without authorization" is a matter for either the arbitrator under § 301 or the National Labor Relations Board under *Garmon*. The motion to certify is denied.

Accordingly, the district court correctly held that plaintiffs' claims arose under federal law and that plaintiffs were not entitled to a judicial remedy on the merits. The court's judgment of dismissal is AFFIRMED.