In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2510

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

and

LOCAL 744, INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,

Intervening Petitioner,

v.

COOK COUNTY SCHOOL BUS, INC.,

Respondent.

Petition for Enforcement of an Order of the
National Labor Relations Board
Nos. 13-CA-38108 and 13-CA-38310

Argued December 6, 2001--Decided March 20, 2002


   Before CUDAHY, EASTERBROOK, and EVANS,
Circuit Judges.

   EVANS, Circuit Judge.  The Cook County
School Bus company provides
transportation for several school
districts northwest of Chicago. Its 60 or
so bus drivers are represented by a local
teamsters union. The Company and the
Union have gotten into more than a
schoolyard scuffle over the Company's
termination of their most recent
collective bargaining agreement.

   We pick up the story on September 23,
1998, when the Union informed the Company
that it wished to negotiate a new
collective bargaining agreement to
replace the one scheduled to expire on
November 30. A series of negotiations
ensued in late October and November.
During negotiations, the Company
advocated a 3-year contractual term,
while the Union wanted a 2-year term. A
3-year term eventually was included in
the first synopsis of a proposed
agreement which was presented to the
Union membership. The membership
overwhelmingly rejected the contract.

During a second round of negotiations, the Company and the Union again haggled over the contract term, but the Company wouldn't budge from its 3-year demand, which again made its way into a synopsis of the agreement. An even thornier issue arose over charters. In addition tooffering transportation to and from school, the Company provides charters for schools (for things like athletic events and field trips) and for private groups. Although drivers like charters since they mean more chances to earn money, charters soak up a lot of the Company's administrative time and account for only 8 percent of its gross revenues. Moreover, the method by which drivers bid on available charters could stump Pythagoras. The process attempts to reconcile factors such as a driver's seniority, the size and location of the requested charter, and whether it conflicts with a driver's normal route. With regard to seniority, junior and senior drivers have different interests, and both the Union and the Company disagree over which seniority lists--company or district-wide--govern.

John McGinn, the Union's chief negotiator, eventually proposed language that bypassed the charter morass. The second synopsis presented to the membership included the following language underneath the term:

Local 744 may notify Cook County School Bus in writing of its desire to reopen this Agreement for negotiations, but provided further, however that such negotiations shall be limited to bidding on charters in Article 12. This Agreement and all other Articles and Sections of this Agreement shall remain in full force and effect as herein above set forth. This reopener shall not extend past November 30, 2000.
The Company did not object to the provision. The membership still rejected the second proposal.

The parties hammered out yet another agreement. Neither the reopener nor the contract term was discussed during these negotiations, so the 3-year term and reopener remained. The Union membership ratified this proposal. Because the parties had negotiated a number of labor agreements over the years, preparing a

final version meant editing the most recent contract, which the Union saved on its computer. That task fell to Ted Bania, the Union's office accountant who doubled (regrettably) as a typist. When Bania typed in the changes, the following language in Article 23 ("Contract Term") appeared before the reopener clause:

This contract shall become effective the 1st day of December, 1998 and shall remain in full force and effect through November 30, 2001 and continue in full force and effect from year to year thereafter, unless terminated by mutual consent of the parties hereto, or unless either party shall notify the other, sixty (60) days prior to November 30, 1999, or November 30th of any year thereafter, of its desire to terminate or amend this agreement.

We have italicized some of this language to foreshadow its importance down the road. For now it suffices to note that nobody mentioned the November 30, 1999, date when the parties signed the agreement in February 1999.

Life went on as normal around the Company until mid-July when three employees approached Robert Smith, the general manager, and expressed their dissatisfaction with the Union. Smith told them he could not discuss the matter and that they should contact the National Labor Relations Board. Then a few times in August a group of employees showed Smith a list of workers who were dissatisfied with the Union. According to Smith, he told the employees he could not get involved.

What Smith did do was write a letter to the Union on September 10. Including the language in Article 23's first paragraph, he expressed the Company's intent of terminating the agreement. On September 13 Smith received a petition signed by 46 drivers stating that they no longer wanted to be represented by the Union. Smith wrote another letter to the Union, stating that the termination would take effect on November 30, 1999, (remember the italics) and that the Company would cease to recognize the Union as the employees' collective bargaining unit as of December 1.

True to its word, on December 1 the Company provided the employees with a

"Management Update." It announced the termination of the labor contract, the withdrawal of recognition for the Union, and the fact that the Company would no longer be subtracting union dues from the drivers' paychecks. Smith also heralded a new lottery drawing to spice things up around the workplace. Every month the Company would award $1,400 at random drawings where 14 employees would be chosen to receive $100 apiece. The Company informed the drivers that the $1,400 was the amount that it previously had deducted every month in Union dues. Drawings were eventually held and winners had their pictures taken and put on a sign saying "I'm a $100 winner!"

Feeling decidedly unlike a $100 winner, the Union filed various administrative charges with the National Labor Relations Board. The Chicago regional office filed a complaint alleging that the Company had engaged in unfair labor practices under sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act. 29 U.S.C. sec. 158(a)(1), (5). After a hearing, an administrative law judge sustained the complaint and recommended an order forcing the Company to cease and desist from its unlawful practices. Both parties filed exceptions to the ALJ's decision and the Board affirmed the ALJ's rulings, findings, and conclusions with minor modification to the remedial order. The Board has now petitioned for enforcement of its order, a proceeding over which we have jurisdiction pursuant to 29 U.S.C. sec. 160(e).

The alleged unfair labor practices here boil down to one issue: whether the Company could terminate the agreement as of November 30, 1999. Although the precise date when a contract ends might be a mundane matter in some situations, it has considerable importance in labor relations because of something known as the contract bar doctrine. Among other effects, this rule, adopted by the Board, prohibits an employer from repudiating a collective bargaining agreement or withdrawing recognition of a union during the agreement's term, even if it has a good-faith belief that a union does not enjoy majority support. NLRB v. Dominick's Finer Foods, Inc., 28 F.3d 678, 683 (7th Cir. 1994). The rule is not under attack here, so if the Company could not terminate the agreement as of

November 30, 1999, it committed unfair labor practices by withdrawing recognition from the Union and by not applying the agreement's terms after December 1. Moreover, if the agreement was still valid, the Company committed unfair labor practices by announcing and implementing its lottery without first bargaining with the Union.

So to the termination date issue we turn. Hopefully our recitation of the parties' negotiations will seem less like a boring field trip to the museum of bargaining history when we note that the Board (via the ALJ) weighed that history in finding that the Company and the Union had agreed to a 3-year term and that the "November 30, 1999" notification date was a typing error that should have read "November 30, 2001."/1 The Board reformed the contract to read accordingly and found that the Company did not have the right to terminate the agreement when it did.

Our usual review in unfair labor practices cases has two prongs. First, per statutory command, we review the Board's factual findings for substantial evidence. 29 U.S.C. sec. 160(e). Second, we review the Board's legal conclusions to determine if they have a reasonable basis in law. Multi-Ad Servs., Inc. v. NLRB, 255 F.3d 363, 370 (7th Cir. 2001). The Company contends, citing Litton Financial Printing Division v. NLRB, 501 U.S. 190 (1991), that because the Board's holding involved contractual interpretation, our standard of review should be de novo. Presumably the Company wants us to review both the Board's factual findings and legal conclusions de novo.

That seems half right. When the Board interprets a collective bargaining agreement in adjudicating an unfair labor practice case, its interpretation is entitled to no special deference. Litton, 501 U.S. at 202-03; Chicago Tribune Co. v. NLRB, 974 F.2d 933, 937-38 (7th Cir. 1992). We take this to mean two things. First, federal courts are in charge of fashioning the federal common law of collective bargaining agreements, see 29 U.S.C. sec. 185, a subject on which the Board has no special expertise, Chicago Tribune, 974 F.2d at 937-38. Therefore we review the Board's legal conclusions on

such matters de novo. Second, because interpretation of language in a collective bargaining agreement is characterized as a matter of law, our review of that interpretation is also de novo.

But we are still faced with the NLRA's command that the Board's factual findings are conclusive if supported by substantial evidence. 29 U.S.C. sec. 160(e). And although the ultimate interpretation of contractual language may be a matter of law, much that surrounds it is not. Where the Board adopts findings divorced from interpretation of language found in the collective bargaining agreement, compare Litton, 501 U.S. at 205-08 (interpreting language of collective bargaining agreement); Chicago Tribune, 974 F.2d at 934-35 (same), we see no reason not to term those factual findings and review them for substantial evidence. This portion of the standard has particular bite in this case, which hardly taxed the Board's interpretive skills. Even a sleepy-eyed first-grader riding one of the Company's school buses would know that the contract provided notification of termination by "November 30, 1999." The fuss is about whether that date accurately reflected the parties' agreement. To resolve that dispute the ALJ had to consider testimony on the parties' bargaining history, which he observed firsthand and as to which he made credibility determinations. As normal, we will review factual findings on these subjects for substantial evidence and follow the credibility determinations "absent extraordinary circumstances." Multi-Ad, 255 F.3d at 370.

After that hubbub, we conclude that the Board got this one right. We reference common law contract principles consistent with federal labor policies. NLRB v. Burkart Foam, Inc., 848 F.2d 825, 829-30 (7th Cir. 1988). As the Restatement puts it, "Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents . . . of the writing, the court may at the request of a party reform the writing to express the agreement." Restatement (Second) of Contracts sec. 155 (1981). In order to be entitled to

reformation, a party must present clear and convincing evidence that the agreement as written does not express the true intention of the parties and that there was a mutual mistake./2 Restatement (Second) of Contracts sec. 155 cmt. c (1981); cf. Board of Trustees v. Insurance Corp., 969 F.2d 329, 332 (7th Cir. 1992) (discussing Restatement position on reformation and requiring clear and convincing evidence). Evidence of such a mistake is admissible despite the parol evidence rule. Restatement (Second) of Contracts sec. 214(d) (1981) (admitting evidence establishing that the written agreement is a product of mistake).

The Board found that the written agreement did not accurately express the intent of the parties because they intended the agreement to last for 3 years, but the November 30, 1999, language in Article 23 mistakenly provided for early termination. The evidence is certainly clear that the parties agreed to a 3-year term. Article 23 states: "This contract shall become effective the 1st day of December, 1998 and shall remain in full force and effect through November 30, 2001." Moreover, the agreement is a book that can be judged by its cover, which states: "Articles of Agreement: December 1, 1998-November 30, 2001."/3 Indeed, the Company originally bargained for the 3-year term and prevailed on that point. Each of the three synopses presented to the Union provided for 3-year duration. McGinn and Edward Natzke, another business agent with the Union, both testified that the agreement was for 3 years. None of the previous eight agreements between the Union and the Company provided less than a 2-year term.

The real issue is whether termination could occur before the end of this term. And the evidence is clear that it could not. The parties negotiated by suggesting and bargaining over changes to the previous collective bargaining agreement. Provisions not amended carried over. The previous agreement provided that either party could provide for notification of termination 60 days prior to November 30, 1998, the end of that agreement's term. And recall how our story began: the Union notified the Company on September 23, 1998, that it wished to renegotiate

the agreement. In fact, with one exception the last four agreements (dating back to 1989) provided for notification of termination 60 days prior to the end of the term. That exception was the 1994-1996 agreement, which stated that the contract could be terminated by giving notice 60 days prior to November 30, 1994, one day prior to the start of the contract term, which makes no sense. Nonetheless, the Union gave notice 60 days prior to November 30, 1996, the end of the contract term. The Company must not have thought that practice odd, given that it negotiated a new agreement. In sum, the well-established practice of the parties and the previous agreement allowed either party to prevent it from rolling over to the next year by giving notice of termination 60 days prior to the end of the term.

Against this bargaining backdrop, the evidence is clear that the parties never agreed that the present agreement could be terminated before that time. McGinn testified that the Union never agreed to a November 30, 1999, termination date. Natzke testified that the November 30, 1999, language was never discussed. The Company claims that the reopener accomplished this result. Recall that the parties were confounded by charter bidding issues and therefore agreed to a reopener on the subject. The Company contends that the clause would have been meaningless without the corresponding right of the Union to terminate the agreement and strike over the issue. The November 30, 1999, date was intended to give the Union (and, incidentally, the Company) the ability to terminate the contract well in advance of the 3-year term should negotiations over the charter bidding system fail.

This argument doesn't make it out of the parking lot. First, the evidence indicates that nobody other than Smith understood the reopener this way. McGinn, who suggested the reopener in the first place, testified that it was not linked to the 3-year term. This is substantiated by a copy of the final agreement that McGinn highlighted after "proofreading" Bania's work. McGinn highlighted portions of the copy that differed from the previous agreement. Although the reopener language was highlighted, the November 30, 1999, language with which it was

purportedly linked was not. McGinn testified that a copy of this highlighted agreement was sent to the Company. Second, the reopener clause, which provides that "[t]his Agreement and all other Articles and Sections of this Agreement shall remain in full force and effect," rebuts the notion that early termination was possible. In fact, Sharon Pierluissi, the Company's assistant general manager, testified that she talked with Smith, and they thought the reopener was "harmless" and was not "opening up the whole contract." McGinn had assured her of the same thing. She believed the agreement expressed the parties' simple willingness to discuss charter bidding. Third, even if there was a link between the reopener and termination, the Union never reopened discussions on charter bidding. The reopener requires written notice, which the Union never gave. Thus, early termination never became an option.

Only Smith's testimony supports the Company's reopener theory. Although Smith testified that he believed the contract could be terminated within a year, the Board discredited his testimony. This finding seems well-supported even on the basis of a cold record. One particularly unenlightening passage is worth quoting at length:

ALJ: Now, you were bargaining for a three year contract?

The Witness:  Yes, sir.

ALJ: And the union wanted a two year contract?

The Witness: Uh-huh, yes.

ALJ: And you agreed on a three year contract, is that correct?

The Witness: Yes.

ALJ: But in effect, the contract is really a one year contract, correct?

The Witness: It's a contract that we have to have language in there where we can open up to insert another complete subject that we really didn't deal with but needed--that we should have dealt with in negotiations.

ALJ: Well, the reopener only went to bidding on charters, correct?

The Witness: Charters is what the subject that we would have been meeting on, yes.

ALJ: But when you wanted to get a three year contract and the union wanted a two year contract, didn't you in effect sign a contract which you saw was for only one year?

The Witness: I look to that as a three year contract that we could open up for the charters.

ALJ: Well, didn't you look at it as a contract that either you or the union could terminate after one year?

The Witness: Uh-huh, yes.

Smith's testimony left the ALJ shaking his head. Ours too. In sum, the reopener argument is just Tuesday morning/4 quarterbacking (for the opposing team, no less).

In light of this bargaining evidence, it is also clear that there was a mutual mistake because neither party caught the error in the contract. The ALJ referred to Bania's mistake as a "simple typing error." It seems likely that Bania did not commit a typographical error in the narrow sense-- he did not write that notice of termination could be given 60 days prior to "Bovember 19, 2001," or "November 40, 2001" or "November 19, 2099"--but rather that he was guilty of sloppy drafting. McGinn testified that the contract should have read November 30, 2001. In response to the question of why McGinn did not catch the error when he proofread the agreement, McGinn commendably admitted, "I don't know. I goofed." The ALJ called McGinn "a very credible witness." The 1994-96 agreement indicates that such mistakes were not uncommon. Smith alone testified that he noticed as of the time of signing that the language provided for early termination. But, as we have stated, the ALJ discredited Smith's testimony and found that Smith "knew full well" that the Company had entered into a 3-year deal (with only a limited reopener) and that notice of termination should be given 60 days prior to November 30, 2001. Substantial evidence supports this

factual finding, and there are no extraordinary circumstances to challenge the credibility determination that undergirds it.

Last, we point out that reformation, an equitable doctrine, is justified in this labor setting. The Union membership did not ratify the actual agreement, which Bania finalized merely for signature by the head honchos. The members ratified the synopsis that preceded it, which noted changes to the previous agreement and contained only the 3-year term alongside the reopener. The synopsis did not contain the November 30, 1999, "typo"--too bad, since one of the drivers might have caught the error. Given the backdrop of the previous agreement, the drivers would not have known that early termination was possible, and it would hoodwink them to condone the Company's actions.

In sum, the Board correctly held that the parties agreed to a 3-year term in which termination notice should be given 60 days prior to November 30, 2001, but that the final agreement did not reflect that understanding. Accordingly, the Company committed the unfair labor practices alleged in the complaint. Because no other challenge has been made to the particulars of the Board's order, we order that it be enforced.

FOOTNOTES

/1 The ALJ also concluded (as did one member of the Board panel) that, even assuming the November 30, 1999, date was properly typed, it merely allowed one of the parties to notify the other 2 years in advance of termination. Because we enforce the Board's order on the first ground, we do not address this second theory.

/2 It is not altogether clear whether the Board relied on the doctrine of unilateral mistake or mutual mistake to justify reformation. The ALJ discussed both. Mutual mistake is the proper ground for reformation. Moreover, although the ALJ did not explicitly reference the "clear and convincing" standard, it seems obvious that he applied it. After conducting a 2-day hearing, he concluded: "It is clear to me that the parties agreed to a 3-year contract and only when [the Company] became aware of the circulation of the decertification petition did it review the con-tract and seize on, what they well knew, was a typographical error."

/3 This effectively answers the Company's argument that in a contract bar analysis, resort to evidence outside the agreement cannot be had. This policy, implemented by the Board, allowsdifferent parties to determine with precision when a petition for decertification or election should be filed. Any reader of the present agreement would know that the contractual term was 3 years.

/4 With the advent of Monday Night Football, "Tuesday" morning quarterbacking is in vogue today. See "Tuesday Morning Quarterback" by Gregg Easterbrook (Universal Publishing).