# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Submitted September 30, 2022     Decided February 14, 2023

No. 21-1188

DISTRICT 4, COMMUNICATIONS WORKERS OF AMERICA
(CWA), AFL-CIO,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

THRYV, INC., FORMERLY KNOWN AS DEX MEDIA, INC., D/B/A
DEXYP,
INTERVENOR

————

On Petition for Review of an Order
of the National Labor Relations Board

————

*Matthew R. Harris* was on the briefs for petitioner.

*Ruth E. Burdick*, Deputy Associate General Counsel, National Labor Relations Board, *David Habenstreit*, Assistant General Counsel, *Julie Broido*, Supervisory Attorney, and *Gregoire Sauter,* Attorney, were on the brief for respondent.

*David Zwisler* was on the brief for intervenor Thryv, Inc. in support of respondent.

Before: SRINIVASAN, *Chief Judge*, PILLARD, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Dissenting opinion filed by *Senior Circuit Judge* SENTELLE.

PILLARD, *Circuit Judge*:  We are asked to decide which of two different retirement-benefit terms binds the parties to a labor agreement.  It is undisputed that, before the parties arrived at the 2016 labor agreement at issue, the Company's benefit plan offered bargaining-unit employees a tax-advantaged defined contribution plan under Internal Revenue Code Section 401(k)—a "401(k)" for short.  It is also common ground that the predecessor collective bargaining agreement did not mention any 401(k) benefit, whereas the new agreement guarantees the employer will continue to provide a 401(k) benefit.  But the parties dispute which of two documents—with different 401(k) terms—reflects their final and binding agreement.

The Company asserted and the Board determined that the binding agreement is the September 16, 2016, Memorandum of Agreement, as hand signed by Company and Union bargaining representatives.  The Union asserts that a different contract document, as typed up and circulated to the parties almost a year later, is the one that binds.  At first blush, it might seem that the later document, finalized and circulated for the parties' reference going forward, must be the authoritative agreement.  And the Company might appear to be on thin ice in objecting to a more generous 401(k) term it concededly inserted into that

finalized document—a term that the Union embraced and now seeks to enforce. But, as the Board recognized, which of the conflicting provisions applies turns on when the parties reached final agreement: The retirement-benefit term they agreed to at that time is the one that binds them.

The hand-signed 2016 Memorandum of Agreement states that "[t]he Union and Employer collectively have reached agreement and the predecessor agreement shall only be revised as specifically set forth herein." J.A. 709. That Agreement's 401(k)-benefit term committed only that the labor agreement would "acknowledge the provision of a 401(k) benefit." J.A. 729. The version posted the following year is a revision of the predecessor labor agreement, meant to incorporate the terms of the 2016 Memorandum of Agreement. In contrast to the hand-signed version, however, the revised contract document states that the employer's 401(k) matching rate will be "no less than 100% for each employee dollar contributed to individual accounts up to 5% maximum contribution." J.A. 371.

When the Company upgraded its retirement-benefit offering in 2018, the Union brought the unfair labor practice charge at issue here. The Union claimed that the Company unilaterally modified the parties' collective bargaining agreement by "implementing a 401(k) contribution matching structure other than that specifically negotiated and memorialized in the CBA [Collective Bargaining Agreement]." Charge Against Employer, Attachment A (stating basis of charge), J.A. 3. The new, objected-to 401(k) plan guaranteed up to 4.8 percent overall match—the same overall match the Company had been providing, but structured a bit more favorably to the beneficiaries than the previous plan by front-loading the employer's matching contribution. The Union pointed to the "5% maximum contribution" language in the revised contract document to assert that the new plan fell

short. The Company responded that it had inserted that 5 percent term by mistake in the process of revising the predecessor agreement to reflect the terms of the 2016 Memorandum of Agreement.

The Board dismissed the complaint, concluding that the parties reached a final and binding labor contract as of September 16, 2016, and that the difference between the 2016 Memorandum of Agreement and the 2017 contract revision resulted from a drafting error. To identify when the parties reached final agreement—and so which 401(k) term binds them—the Board considered evidence of the parties' bargaining history. The Board found that the parties reached final agreement at the close of negotiations in September 2016, when they signed the 2016 Memorandum of Agreement as the exhaustive list of their agreed revisions to the 2013 predecessor contract. During negotiations, the Board found, the Union had proposed and the Company rejected a 6 percent and then a 5 percent 401(k) match. The decisive compromise leading to agreement on the new contract was to expressly acknowledge a 401(k) benefit, without commitment to any particular match.

The Company's Board of Directors and the bargaining unit members ratified the new contract in late 2016 based on the 2016 Memorandum of Agreement. The follow-up communications between the Company's and Union's representatives in 2017 were aimed at revising the 2013 contract's text to reflect the terms of the Agreement they had reached; the parties never purported to be negotiating substantive terms during that ministerial process. In that context, the Board permissibly determined that the hand-signed 2016 Memorandum of Agreement was final, binding, and exhaustive, such that its retirement-benefit term governs.

The Union seeks review here, arguing that the Board misapplied its precedent, impermissibly considered parol evidence of the parties' bargaining history, and found facts unsupported by substantial evidence. For the reasons that follow, we deny the petition for review.

## BACKGROUND

### I.      Facts

DexYP (the Company) publishes and sells the Yellow Pages phone directory and other marketing tools. The Company was known as YP Midwest Publishing until June 2017, when it was acquired by Dex Media Holdings, Inc. and became DexYP. DexYP has a collective bargaining relationship with the Communication Workers of America (the Union), which represents a bargaining unit of staff associates, service representatives, customer service specialists, and art technicians. YP Midwest Publishing and the Union had entered into a 2013 Collective Bargaining Agreement and a 2016 successor Collective Bargaining Agreement. When Dex Media Holdings acquired the Company in 2017, the 2016 agreement remained in effect and the new management committed to honoring all existing Collective Bargaining Agreements and bargaining obligations.

The parties to the 2016 collective bargaining negotiations used the terms of the 2013 Collective Bargaining Agreement as the baseline from which they bargained. That predecessor contract consisted of a main agreement with forty-one articles and seven exhibits, plus thirty-seven side letters, a 2013 memorandum of agreement, and three appendices. Although that pile of documents comprising the 2013 contract made no mention of retirement benefits, the employer's benefits plan at the time included a 401(k) benefit for which the bargaining unit employees were eligible. That 401(k) plan provided that, for

employees who contributed up to 6 percent of their salary to a 401(k) account, the employer would match the employees' contributions at 80 percent, *i.e.*, contribute to an employee's retirement account an amount equal to 4.8 percent of the employee's salary.

In September 2016, the Company and the Union signed a twenty-page Memorandum of Agreement memorializing the various revisions they agreed to make to the 2013 contract. The cover page of the Memorandum of Agreement stated: "The Union and Employer collectively have reached agreement and the predecessor agreement shall only be revised as specifically set forth herein." J.A. 709. The Memorandum of Agreement reads like a to-do list of items to be written into the text of the predecessor agreement, with twenty-four revisions identified. Some revisions are short and straightforward: "Delete Letter 25 and Letter 30." J.A. 729. Other revisions specify new language for existing articles, increase certain reimbursement rates and weekly wages, or set conditions for new Company roles. The Memorandum addresses 401(k) retirement benefits as follows: "The Company agrees to acknowledge the provision of a 401(k) benefit to bargaining union [sic: unit] employees in the drafting of the collective bargaining agreement." J.A. 729.

The Company and Union did not complete the revised document incorporating their negotiated revisions into the existing contract until almost a year later. The cover page of that contract document as distributed late in 2017 is nearly identical to the cover page of the 2016 Memorandum of Agreement. The only difference is that actual signatures appeared on the cover page of the Memorandum, whereas the signatories' names were typed on the cover of the document as posted and circulated. But the signatories are the same, and both documents show September 16, 2016, as the signing date.

Indeed, the Company signatory whose name is typed in is Keith Halpern—who represented DexYP at negotiations during 2016 and hand signed the Memorandum of Agreement—even though he no longer worked for the Company when the revised contract document was produced with his name typed on it in 2017.

Central to the current dispute, the revised contract document as circulated includes specific language about the 401(k) benefit that is absent from the 2016 Memorandum of Agreement. Whereas the Agreement states only that the Company would "acknowledge the provision of a 401(k) benefit," the circulated contract document says: "The Company 401K matching rate for all bargaining unit employees will be no less than 100% for each employee dollar contributed to individual accounts up to 5% maximum contribution." J.A. 371, 729. The question here is which of those terms reflects the binding agreement of the parties.

To resolve which 401(k) term controls, the Board considered the parties' bargaining history for the 401(k) term and made factual findings. In brief, the Board recounted the following series of events.

In the negotiation for the 2016 Collective Bargaining Agreement, the Union sought to secure a labor-contract term protecting employees' 401(k) benefits. Over the course of negotiations, the Union twice unsuccessfully sought to secure a specific level of employer match of employees' 401(k) contributions. In June 2016, the Union proposed "to change the Company matching rate so that all bargaining unit employees receive[d] a Company match of 100% for each employee dollar contributed to individual accounts up to 6% maximum contribution." J.A. 776 (Resp. Exh. 6 – Company-Held Bargaining Proposals and Bargaining Notes). YP

Midwest Publishing rejected the offer. Later that month, the Union proposed a 100 percent employer match up to 5 percent maximum contribution. The Company also rejected that offer.

After the Union and YP Midwest Publishing failed to reach agreement on the amount of a 401(k) match, they settled on a compromise to prevent the employer from eliminating the benefit: Teri Pluta, the lead Union negotiator, and Keith Halpern, the lead Company negotiator, agreed to "have language in the contract that guarantees the 401(k)." J.A. 161. As Pluta later testified, the Union's negotiating committee members anticipated the change in Company ownership that in fact took place in June 2017, and they "fear[ed] that . . . a new owner may or may not honor collective bargaining agreements, past practice, [or] provide the same type of benefits, so it became more important to [the] committee to make sure that they could get some guarantees there." J.A. 159.

Steve Flagler, a Company attorney, testified that the Company never agreed to a 5 percent 401(k) match during the pre-ratification negotiations, but only agreed to "have a reference in the contract to the fact that there was a 401(k) plan offered to [the Union's] members." J.A. 114. Testifying as a rebuttal witness, Pluta repeatedly acknowledged on cross examination that the Company never agreed during negotiations to a 5 percent 401(k) match, and that "language that would guarantee the 401(k)" was "the very last item that sealed the deal . . . ." J.A. 187.

At the close of negotiations in September 2016, employer and Union representatives drafted and signed the 2016 Memorandum of Agreement. Shortly after the negotiators signed the Memorandum of Agreement, the bargaining unit members and the Company's Board of Directors both ratified the new Collective Bargaining Agreement as memorialized in

the Memorandum of Agreement. That Collective Bargaining Agreement became effective for a three-year term.

Almost a year later, after Dex Media Holdings acquired the Company, the Company and Union completed the revised document incorporating their negotiated revisions into the existing contract. In April 2017, seven months after negotiations concluded, Union representative Teri Pluta emailed the Company's labor counsel, Brian Herman, and asked why the revised contract was not yet ready. Herman emailed a document eleven days later, with redlines marking the changes from the 2013 contract. No party representative remarked on the 5 percent language at the time, but Teri Pluta later testified that it was in "the first draft that came from YP." J.A. 164. In September 2017, Pluta emailed back to Steve Flagler, another Company attorney, a clean version of the document, explaining that she had accepted the redlined revisions and fixed an error: a missing wage scale for a new position the parties agreed to in the 2016 negotiations. In that email, Pluta told Flagler that the document was ready to be posted as the updated contract.

Flagler responded that he would post the contract to the Company intranet and print copies for the local unions. Flagler and Herman reviewed the document before posting it to the intranet. As Flagler later acknowledged, he "missed" the reference to a 5 percent match when he reviewed the post-ratification revisions. J.A. 116.

There was no substantive discussion or approval action by either side beyond the October 2016 ratification vote by the bargaining unit members and approval by YP Midwest Publishing's Board of Directors. Pluta testified that, in the interim between the April 2017 and the September 2017 emails, the Union and the Company had no discussions about

401(k) benefits and exchanged no other versions of the revised contract.

A month after Company representative Steve Flagler posted the updated document, a local Union vice president alerted a Union representative that the Company was planning changes to the 401(k) benefits plan in 2018. After the Union representative asked DexYP to send information on the new plan, the Company sent a benefits summary showing that the 2018 benefits plan would maintain a maximum 4.8 percent employer matching contribution but change to a more generous matching formula. The 2016 Company benefits plan had included an 80% match on employee contributions up to 6% of employee compensation, which the 2018 plan replaced with a graduated, front-loaded match formula, matching 100% of employee contributions for the first 3% of compensation and 60% of contributions for the next 3%.

## II.    Decision on Review

In 2018, the Union brought an unfair labor practice charge against DexYP over the Company's 2018 retirement benefits plan. The Union argued that DexYP violated the Collective Bargaining Agreement by adopting a retirement benefits plan that did not comply with the language in the revised document guaranteeing a 100% match of employee contributions up to 5% of compensation. After investigating the charge, the Board's Regional Director brought a complaint alleging that DexYP unilaterally changed the 401(k)-contribution formula, along with other allegations that the parties later settled.

Defending against the complaint at a hearing before the Board administrative law judge (ALJ), DexYP argued that the 5 percent match language in the Collective Bargaining Agreement resulted from a drafting error. The Company introduced—without objection from the Board's General

Counsel or the Union—the 2016 Memorandum of Agreement that the parties signed at the close of negotiations.

DexYP also sought to introduce other evidence: testimony about the 2016 negotiations and bargaining notes from those sessions. The General Counsel and the Union objected, arguing that the parol evidence rule barred evidence about the negotiations. The ALJ admitted the testimony about the 2016 negotiations and associated bargaining notes under the mistake exception to the parol evidence rule. Under that exception, the Board allows oral testimony to show that a written agreement contains an obvious mistake. *Apache Powder Co.*, 223 N.L.R.B. 191, 191 (1976). The ALJ noted when she decided to hear parol evidence that the parties would have an opportunity to address, in their post-hearing briefs, whether a mistake occurred and whether the ALJ should ultimately consider the parol evidence in the decision. The parol evidence included the above-described testimony of Company negotiator Steve Flagler and Union negotiator Teri Pluta about the 2016 negotiations and the process of revising the contract document for posting in 2017.

In a written decision after the hearing, the ALJ recommended that the Board dismiss the complaint. *YP Midwest Publ'g, LLC*, 371 N.L.R.B. No. 23, at 9 (Aug. 26, 2021). Analyzing witness credibility, the ALJ "did not find much of [Union negotiator Teri] Pluta's testimony credible" because "[s]he sparred with Respondent's counsel on cross-examination, gave contradictory testimony, and testified in an equivocal manner." *Id.* at 5. The ALJ generally credited the other witnesses who testified.

The ALJ found that "[t]he only agreement reached by the parties at the bargaining table regarding the 401(k) benefit was that [the Company] would acknowledge its provision to its

union-represented employees in the collective bargaining agreement." *Id.* at 7. The parties reached "[n]o agreement" on the matching amount for employer 401(k) contributions. *Id.* Under those circumstances, the ALJ concluded, "the negotiated agreement that the [Memorandum of Agreement] would contain a memorialization of the existence of [the Company's] 401(k) program controls." *Id.*

The ALJ concluded that considering parol evidence from the parties' negotiations was appropriate because, under the Board's holding in *Apache Powder*, 223 N.L.R.B. at 191, "the parol evidence rule does not operate to exclude testimony offered to establish that no agreement was reached in the first place." *YP Midwest Publ'g*, 371 N.L.R.B. at 6. The ALJ found that neither the Company nor its predecessors had ever "matched represented employees' [401(k)] contributions at 5 percent," and, based on the evidence regarding the 2016 negotiations, "[t]he record evidence conclusively established that a 5 percent match was never agreed to in bargaining." *Id.* at 6-7. The ALJ found that, during negotiations, "the parties only agreed to memorialize the existence of [DexYP's] 401(k) program," that "[n]o specified amount of employer match was ever established," and that the Company mistakenly included the 5 percent match in the revised contract. *Id.* at 6-8. The ALJ found that the parties engaged in no further negotiations, nor did they discuss any change in positions, between the close of negotiations in fall 2016 and the revision of the contract document in summer 2017. *See id.* at 4. As to whether the Company's inclusion of a 5 percent 401(k) match in its redline markup of the predecessor agreement was an error that should have been obvious to the Union, the ALJ did not credit Pluta's testimony that she believed the matching amount was "language as promised" from the Company, J.A. 199, and not "inconsistent" with the 401(k) match the members were

receiving or with the negotiators' agreement to acknowledge the 401(k) plan, J.A. 200.

On administrative appeal, the Board affirmed the ALJ's findings and conclusions. *Id.* at 1. Like the ALJ, the Board accepted the 2016 Memorandum of Agreement as memorializing the agreement the parties reached in their negotiations. *Id.* at 1 n.2. Analyzing the Memorandum of Agreement, the Board concluded that the parties agreed the Company would "*acknowledge the provision of a 401(k) benefit*" in the revised contract but did not agree to any specific matching percentage. *Id.* (emphasis in original). The Board sustained the ALJ's admission of parol evidence of the 2016 negotiations under *Apache Powder*. *Id.* (citing *Apache Powder*, 223 N.L.R.B. at 191). After considering that evidence, the Board held that DexYP's "drafting error should have been clearly obvious to the Union" given YP Midwest Publishing's "clear rejection of the Union's proposal for a 5 percent match" and the lack of any "basis for the Union to assume that [the Company] had changed its position on that proposal." *Id.*

The Union petitioned for review. DexYP, now operating under the name Thryv, Inc., intervened in support of the Board.

## DISCUSSION

The Union argues that the Board erred by crediting the 401(k) retirement-benefit term in the parties' 2016 Memorandum of Agreement, admitting parol evidence, and finding that the revised Collective Bargaining Agreement circulated and posted as the final 2016-2019 contract reflected a drafting error. We hold that the Board acted in accordance with the law, including its own precedent, and that substantial evidence supports its findings.

## I.     Standard of Review

We review the Board's administrative adjudications with "a very high degree of deference." *Ozburn-Hessey Logistics, LLC v. NLRB*, 833 F.3d 210, 217 (D.C. Cir. 2016) (quoting *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011)). Within that limited scope of review, "we must uphold the judgment of the Board unless its findings are unsupported by substantial evidence, or it acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Novato Healthcare Ctr. v. NLRB*, 916 F.3d 1095, 1100 (D.C. Cir. 2019). Where a party challenges the Board's application of its own precedent, we review whether the Board's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Leggett & Platt, Inc. v. NLRB*, 988 F.3d 487, 494 (D.C. Cir. 2021). So long as the Board offers a well-reasoned interpretation of its precedent, we defer to that interpretation. *Ceridian Corp. v. NLRB*, 435 F.3d 352, 355 (D.C. Cir. 2006).

We review factual findings supporting the Board's contract interpretation under the substantial evidence standard, "including evidence of intent from bargaining history, and other factual findings on matters bearing on the intent of the parties." *Pac. Mar. Ass'n v. NLRB*, 967 F.3d 878, 884-85 (D.C. Cir. 2020) (quoting *StaffCo of Brooklyn, LLC v. NLRB*, 888 F.3d 1297, 1302 (D.C. Cir. 2018)); 29 U.S.C. § 160(e). We owe no special deference to the Board's interpretation of contract language, but review it *de novo*, applying "ordinary principles of contract law." *Pac. Mar. Ass'n*, 967 F.3d at 885 (quoting *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015)).

## II. The Board Correctly Identified the Binding Agreement and 401(k) Term

We first consider the Union's argument that the Board erred by treating the 2016 Memorandum of Agreement as authoritative rather than the document produced the following year and circulated as the final revised contract. The Union argues that the Board's precedent required it to credit the 401(k) term in the revised contract document over the term reflected in the Memorandum of Agreement. We review that challenge in two steps. We first consider whether the Board reasonably applied its precedent regarding when a collective bargaining agreement is formed. We then address whether substantial evidence supports the Board's finding that the 2016 Memorandum of Agreement reflects the parties' agreement on the 401(k) term.

We hold that the Board followed its own precedent by looking to the Memorandum of Agreement for the substance of the parties' agreed 401(k) term. The 401(k) terms in the two relevant documents conflicted. The parties agreed in the 2016 Memorandum of Agreement only to "acknowledge" the "provision" of a 401(k) benefit, whereas the document posted in 2017 promised a 401(k) benefit whereby the employer would match employees' own contributions of up to 5 percent of their salary. To decide which term controlled, the Board followed its established approach for deciding when the parties reached a meeting of the minds and which terms controlled at that time.

Under Board precedent, "[i]t is well-established that a collective bargaining agreement is formed after a meeting of the minds on substantive issues and material terms." *Cnty. Concrete Corp.*, 366 N.L.R.B. No. 64, at 9 (2018). The meeting of the minds "is measured not by parties' subjective

inclinations, but by their intent as objectively manifested in what they said to each other." *Id.* (quoting *Crittenton Hosp.*, 343 N.L.R.B. 717, 718 (2004)).

To decide when the parties agreed on material terms, the Board looks to "mutual expressions of satisfaction about the successful negotiation of a contract [as] 'hallmark indication[s] that a binding agreement has been reached at the end of negotiations.'" *ABM Parking Servs.*, 360 N.L.R.B. 1191, 1204 (2014) (quoting *Chauffeurs Loc. Union No. 771*, 357 N.L.R.B. 2203, 2207 (2011)). For example, the Board has held that an employer and a union reached a meeting of the minds at a negotiating session where the parties "concluded that session with handshakes and mutual expressions of satisfaction on their successful negotiation of a contract." *Windward Teachers Ass'n*, 346 N.L.R.B. 1148, 1150-51 (2006); *see also Chauffeurs Loc. Union No. 771*, 357 N.L.R.B. at 2207. The Board likewise discerned a meeting of the minds where an employer's "remarks . . . were the email equivalent of shaking hands on the deal at the end of a face to face meeting." *ABM Parking Servs.*, 360 N.L.R.B. at 1204. By the same token, bargaining unit employees' "unqualified ratification" of an expired predecessor collective bargaining agreement together with a document reflecting "all of the agreed-on contract changes" similarly sufficed to show that the parties reached a binding agreement. *Graphic Commc'ns Union*, 318 N.L.R.B. 983, 992 (1995).

A collective bargaining agreement may be binding before the parties reduce it to a final written form. To be sure, "once an agreement is reached, each party is obligated to assist in reducing the agreement to writing." *Ebon Servs.*, 298 N.L.R.B. 219, 223 (1990). But the Board has long followed the rule that "offer and acceptance, not execution, make a labor contract." *Sarauer v. Int'l Ass'n of Machinists & Aerospace Workers,*

*Dist. No. 10*, 966 F.3d 661, 677 (7th Cir. 2020). "Once an agreement is reached by the parties, they are obligated to abide by the terms of the agreement even though those terms have not been reduced to writing." *Cnty. Concrete Corp.*, 366 N.L.R.B. at 1 n.1 (quoting *Sunrise Nursing Home, Inc.*, 325 N.L.R.B. 380, 389 (1998)). Indeed, "[t]he question of contract formation is based on the parties' expressed intentions regarding the terms of a collective-bargaining agreement," which may establish a contract was formed even in advance of any document being signed. *Sunrise Nursing Home, Inc.*, 325 N.L.R.B. at 389. Once the parties reach agreement, ensuing back-and-forth about the contract may be "merely communications aimed at converting their agreement into a complete, written contract." *ABM Parking Servs.*, 360 N.L.R.B. at 1204.

The Board's treatment of collective bargaining agreements as binding before they are reduced to a final writing helps to protect the bargaining process. For example, the Board has held that a party that refuses to sign an agreement after acquiescing to its terms during negotiations "impairs the bargaining process and tends to frustrate the aim of the [National Labor Relations Act] to secure industrial peace through collective bargaining." *H. J. Heinz v. NLRB*, 311 U.S. 514, 526 (1941). To avoid those problems, the Board treats the refusal to sign a written contract after reaching agreement on its terms through negotiation as an unfair labor practice under Section 8(b)(3) of the National Labor Relations Act. *Windward Teachers*, 346 N.L.R.B. at 1150.

Applying those principles to this case, the Board did not need to look for handshakes or email acceptances. The record contains direct evidence of the terms the parties reached during negotiations: the signed September 2016 Memorandum of Agreement. The Board's decision to credit the 2016

Memorandum of Agreement as reflecting the parties' agreed 401(k) term accords with its established precedent referencing the "meeting of the minds" to identify when the parties reached a binding agreement and to treat as authoritative the terms they agreed to at that time.

Substantial evidence supports the Board's conclusion that the Memorandum of Agreement represented the parties' binding agreement on the 401(k) term. The Memorandum of Agreement stated that the "Union and Employer collectively have reached agreement and the predecessor agreement shall only be revised as specifically set forth herein." J.A. 709. The employer and Union representatives signed the cover page and initialed each page. The bargaining unit members and the Company's Board of Directors ratified the 2016 Memorandum of Agreement as their negotiated updates to the predecessor Collective Bargaining Agreement. By signing an agreement stating that the prior contract would be revised only as specifically agreed in the Memorandum of Agreement, and by sending that package through the ratification process, the parties showed that they regarded the Memorandum of Agreement as the binding document memorializing their new Collective Bargaining Agreement.

The leisurely way the parties went about revising the 2013 contract's text to reflect the agreed-to changes reinforces the importance of the 2016 Memorandum of Agreement. It was not until April 2017, seven months after signing the Memorandum of Agreement, that Union representative Teri Pluta asked DexYP counsel Brian Herman why the Company had not yet sent the Union a document incorporating the negotiated changes into the preexisting contract. Herman sent a redlined document eleven days later, and Pluta took nearly five more months to return it to him, writing that she had accepted the revisions and included a missing wage scale for a

new position. The parties apparently never even pointed out or acknowledged during the revision process the 5 percent matching term that appeared in the revised contract document, and they expressed confusion before the ALJ about how it got there. The bargaining unit members and the Company's Board of Directors had ratified the Memorandum of Agreement in 2016; neither party undertook any ratification process for the revised contract document in 2017.

The cover page of the revised contract document refers to September 16, 2016, as the date of the agreement. The cover pages of both the 2016 Memorandum of Agreement and the contract package as revised, posted, and circulated in 2017 reflect that same September 2016 date—when Company and Union negotiators signed the 2016 Memorandum of Agreement, not when Herman and Pluta finished incorporating the changes into the text of the predecessor agreement or when the Company posted it on its intranet. The signatories are the same—with signatures handwritten on the September 2016 Memorandum of Agreement and the same names typed on the revised version circulated to employees in 2017—even though the employer's signatory, Keith Halpern, no longer worked for the Company when the revision was done. Halpern's replacement, Brian Herman, supervised the revision process, but Halpern's is the only name that appears on the final version.

The timing of the parties' ratification of the contract terms, together with the casual pace at which the parties later incorporated the negotiated revisions into the predecessor agreement, supports the Board's conclusion that it was the Memorandum of Agreement that was binding. The use of the same employer signatory even after his departure from the Company reinforces that the parties' agreement was finalized in September 2016, not 2017. Substantial evidence supports the Board's finding that the 401(k) term in the ratified 2016

Memorandum of Agreement, not the post-ratification revision, reflects the parties' binding agreement.

### III. The Board Permissibly Considered Parol Evidence

Next, we review the Board's application of the parol evidence rule. The Union argues that the Board incorrectly relied on *Apache Powder*, 223 N.L.R.B. 191, to admit testimony and bargaining notes relating to the 2016 negotiations to discern the Company's mistake. In the Union's view, the Board should have instead followed its precedent in *Windward Teachers Association*, 346 N.L.R.B. 1148 (2006), and *Ebon Services*, 298 N.L.R.B. 219 (1990), two cases in which the Board rejected a mistake defense and enforced a collective bargaining agreement as written. That precedent, says the Union, requires enforcement of the term inserted in the 2017 contract revision rather than the term reflected in the 2016 Memorandum of Agreement. We must determine whether, in looking to parol evidence to resolve that claim, the Board arbitrarily and capriciously departed from its precedent. *ABM Onsite Services-W., Inc. v. NLRB*, 849 F.3d 1137, 1146 (D.C. Cir. 2017).

The Board recognized the mistake exception to the rule against parol evidence in *Apache Powder* when it held that "the parol-evidence rule does not operate to exclude testimony offered to establish that in fact no agreement was reached in the first place." 223 N.L.R.B. at 191. The employer in *Apache Powder* had refused to sign a collective bargaining agreement because, it claimed, the agreement the parties initialed and ratified contained a mistake. *Id.* at 193-94. It sought to offer parol evidence to show that, during negotiations, it inadvertently proposed a start date for higher monthly pension benefits a year earlier than the parties intended. *Id.* at 194. The

ALJ admitted the parol evidence, recognizing that evidence outside an agreement "may be introduced for the purpose of ascertaining the correct interpretation of an agreement, as well as to establish the nonexistence of an agreement." *Id.* (internal citations omitted). After considering the parol evidence, the ALJ found that the start date was indeed a drafting error. *Id.* The Board affirmed. *Id.* at 191. The Board cautioned that "rescission for unilateral mistake is, for obvious reasons, a carefully guarded remedy," but held the standard met because the start-date mistake was "so palpably at odds with the pension provisions of the existing contract as to put the [union] on notice of an obvious mistake by the [employer]." *Id.*

*Apache Powder* established two rules relevant here: First, parol evidence is admissible to establish whether an agreement was reached; second, a unilateral mistake occurs "where the mistake is so obvious as to put the other party on notice of an error." *Id.*

The Board has consistently relied on the *Apache Powder* formulation of the mistake exception to the parol evidence rule. In some decisions, the Board discusses parol evidence before concluding that no mistake occurred and enforcing an agreement as written. *See, e.g.*, *Monterey/Santa Cruz Bldg. Trades Council* (*Nat'l Refractories*), 299 N.L.R.B. 251, 257 (1990). In others, the ALJ admits parol evidence at the hearing but, on consideration, finds no need to refer to it in the written decision. *See, e.g.*, *Sheehy Enterprizes, Inc.*, 353 N.L.R.B. 803, 805 n.1 (ALJ decision), 806 (2009). Other Board decisions, like *Apache Powder* and the decision under review, consider parol evidence and, based on the bargaining history it discloses, conclude that the written agreement contains a mistake. *See, e.g.*, *Waldon, Inc.*, 282 N.L.R.B. 583, 584-86 (1986); *Cook Cnty. Sch. Bus, Inc.*, 333 N.L.R.B. 647, 653 (2001), *enforced*,

283 F.3d 888, 896 (7th Cir. 2002); *Globe-Union, Inc.*, 245 N.L.R.B. 145, 147 (1979).

The mistake exception finds support not only in Board precedent, but in accepted principles of generally applicable contract law. *See M & G Polymers*, 574 U.S. at 430, 433 (2015). Contract doctrine recognizes that "oral testimony is admissible to prove fraud or misrepresentation, mistake, or illegality." 6 Corbin on Contracts § 25.20 (2022). "Such invalidating causes need not and commonly do not appear on the face of the writing." Restatement (Second) of Contracts § 214 (2022). And, "[s]ince the application of the parol evidence rule depends on the existence of a valid integrated contract, the rule does not preclude evidence which contradicts the very existence or validity of an alleged contractual obligation." 11 Williston on Contracts § 33:14 (4th ed. 2022).

Our dissenting colleague argues that the 2016 signed and ratified Memorandum of Agreement is itself parol evidence. Diss. Op. at 2. But as explained, that Memorandum of Agreement is itself the agreement that binds the parties. Necessarily, then, it is not parol evidence. And indeed, the Union and the Board's General Counsel never objected to consideration of that document as parol evidence. At the hearing before the ALJ, neither the Union nor General Counsel objected when the Company introduced the Memorandum of Agreement. They raised the parol evidence objection only to oral testimony about the negotiations preceding that signed contract.

The Union argues that by admitting parol evidence in this case the Board departed from its decisions in *Windward Teachers Association*, 346 N.L.R.B. 1148, and *Ebon Services*, 298 N.L.R.B. 219. Because the Board in those two cases enforced written contract terms, the Union reasons, the Board

should enforce the revised contract's terms here. But the Board in both of those cases considered oral testimony about the parties' bargaining history before concluding that the written terms accurately reflected the parties' agreement at the close of negotiations. *Windward Teachers*, 346 N.L.R.B. at 1148-50; *Ebon Servs.*, 298 N.L.R.B. at 220-22. The Union's objection here is accordingly reduced to a challenge to the Board's factual finding that the revised contract contained a drafting error, not the ALJ's admission of parol evidence to consider whether a mistake occurred.

### IV. Substantial Evidence Supports the Board's Mistake Finding

We next consider whether substantial evidence supports the Board's finding that the specific 401(k) language in the revised document was a mistake. The Board found that "it should have been obvious to the Union that the inclusion of a specific matching percentage of 5 percent did not reflect the parties' understanding and was a drafting error." *YP Midwest Publ'g, LLC*, 371 N.L.R.B. at 1 n.2. To so find, the Board applied the standard for unilateral mistake from *Apache Powder*: A finding of unilateral mistake is a "carefully guarded remedy," appropriate "where the mistake is so obvious as to put the other party on notice of an error." 223 N.L.R.B. at 191. The Union challenges that determination, arguing that even if the employer mistakenly added the 5 percent match language to the draft, the mistake was not obvious enough to place the Union on notice. Substantial evidence supports the Board's finding to the contrary.

*De novo* review of the dueling contract terms themselves does not reveal whether the 401(k)-benefit term offering a 5 percent match resulted from a mistake. Where contract language contains a drafting error, the mistake "commonly

24

do[es] not appear on the face of the writing." Restatement (Second) of Contracts § 214. The mistake here is apparent only in light of the Board's findings about the bargaining history. The deference we owe to the Board's findings of fact extends to its findings that describe bargaining history and provide context showing when and how the parties reached agreement. *See Pac. Mar. Ass'n*, 967 F.3d at 885.

The facts of the parties' course of bargaining reveal that they had reached a complete and binding agreement in September 2016, when the parties signed the Memorandum of Agreement stating they would "acknowledge" the 401(k) benefit, and that the parties promptly ratified the agreement on that basis. J.A. 729. Their binding agreement did not include the language guaranteeing a 5 percent match, which was only mistakenly inserted the following year during the process of updating the predecessor contract for circulation. *See supra* at 18-20. Several of our sister circuits have looked to ratification as the "last act necessary" to create an enforceable labor contract. *Sarauer*, 966 F.3d at 676; *Mack Trucks, Inc. v. United Auto, Aerospace & Agr. Implement Workers of Am.*, 856 F.2d 579, 592 (3d Cir. 1988); *NLRB v. Deauville Hotel*, 751 F.2d 1562, 1569 n.10 (11th Cir. 1985); *Sw. Airlines Co. v. Loc. 555, Transp. Workers Union of Am.*, 912 F.3d 838, 846-47 (5th Cir. 2019). On that logic, the Seventh Circuit affirmed a Board finding of mistake where a drafter introduced a post-ratification typo into a contract. *NLRB v. Cook Cnty. Sch. Bus, Inc.*, 283 F.3d 888, 895-96 (7th Cir. 2002). There, the Seventh Circuit observed that bargaining unit members ratified an earlier synopsis without the typo and had never voted to adopt the later-appearing "actual agreement," which a union representative had finalized (with a typo) "merely for signature by the head honchos." *Id.* at 895.

Enforcing the ratified agreement here—rather than the revised contract document as circulated and posted—is unassailable where the record contains no evidence of "renegotiation of the agreement's terms" after the date of ratification. *Sarauer*, 966 F.3d at 676. Again, YP Midwest Publishing negotiator Steve Flagler and Union negotiator Teri Pluta both testified that the Union never persuaded the Company during negotiations to agree to a 5 percent 401(k) match. Yet the language that ultimately ended up in the agreement—language nearly identical to the language that the Company had rejected in June 2016—called for a 5 percent match. Under those circumstances, substantial evidence supports the Board's conclusion that the 5 percent match was a drafting error that should have been obvious to the union.

The Union argues that the Board erred by not following *Ebon Services*, 298 N.L.R.B. at 219 n.2, 223 and *Windward Teachers*, 346 N.L.R.B. at 1151, to hold that parties are bound by language they reviewed and agreed to sign. The Board should have held the 5 percent 401(k) match term binding, says the Union, because it was consistent with the term of the 2016 Memorandum of Agreement, so not a mistake. The cases on which the Union relies are consistent with the Board's approach to determining when a binding agreement was reached in the first place. In *Ebon Services* and *Windward Teachers*, parties successfully challenged their counterparties' refusals to sign agreements with language they had agreed to at the close of negotiations. *Ebon Servs.*, 298 N.L.R.B. at 219 n.2; *Windward Teachers*, 346 N.L.R.B. at 1151. In both cases, the Board considered oral testimony about the parties' negotiations, then decided that the written terms accurately reflected the parties' agreement at the close of negotiations. *Ebon Servs.*, 298 N.L.R.B. at 224-25; *Windward Teachers*, 346 N.L.R.B. at 1149-50. Specifically, the employer in *Ebon Services*, having read over the agreement and verbally agreed

to sign, ultimately refused to sign even though "there was no mutual mistake or misunderstanding about any of the terms" in the agreement. 298 N.L.R.B. at 224-25. And in *Windward Teachers*, the union claimed mistake and so refused to sign an agreement even though the disputed language had been present in the draft agreement during the final negotiating session when the parties reached agreement. 346 N.L.R.B. at 1149. The Board's decision in this case reflects the same approach it has used in prior cases to identify the terms the parties agreed to in negotiations and enforce the written agreement memorializing those terms.

The Board recognizes that resorting to parol evidence to find a unilateral mistake in a written agreement is reserved for "unusual instance[s]." *Apache Powder*, 223 N.L.R.B. at 191. Rightly so. Consistent with that recognition, the Board in the decades since *Apache Powder* has declined to recognize unilateral mistake in the absence of a mistake so obvious as to communicate to the opposing party that it was unlikely to have been intended. For example, the Board has rejected a mistake defense where a union negotiator "hurriedly glanced at" a side letter before approving it, then later argued that he did not intend to agree to the letter's terms. *Television Artists AFTRA (Eleven-Fifty Corp.)*, 310 N.L.R.B. 1039, 1041, 1044 (1993). The Board has also declined to find mistake where a negotiator made incorrect assumptions before agreeing to a contract term. *Nat'l Refractories*, 299 N.L.R.B. at 257. The reasoning in those cases, as here, treats as binding the terms that the parties agreed to and submitted for ratification at the conclusion of their negotiations. *Id.*; *Eleven-Fifty Corp*, 310 N.L.R.B. at 1043. Here, the parol evidence of the parties' bargaining history allowed the Board to identify the Memorandum of Agreement as the final product of the parties' negotiations, and to conclude that the 401(k) term in the 2017 revised version of

the Collective Bargaining Agreement contained an unenforceable unilateral mistake.

\* \* \*

For the foregoing reasons, we deny the petition for review.

*So ordered.*

SENTELLE, *Senior Circuit Judge*, dissenting: This case presents a straightforward contract dispute between Communications Workers of America ("the Union") and DexYP ("the Company"). The Union and the Company negotiated. They reduced their negotiations to a written agreement, the Collective Bargaining Agreement ("CBA"). And both parties signed the agreement. That is the end of the story. The National Labor Relations Board in the opinion under review erred in accepting parol evidence to rewrite that agreement. In this Court, the majority cites Williston and Corbin for the proposition that a court may review parol evidence in the cases of fraud, misrepresentation, or lack of a valid integrated contract. Op. at 22. But there is an even more fundamental rule of contracts: courts hold parties to their bargains. *See, e.g.*, *NRM Corp. v. Hercules Inc.*, 758 F.2d 676, 681 (D.C. Cir. 1985) ("Where the language of a contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to those words reflects the intentions of the parties.").

First, the "mistake" in the 2017 CBA, supposedly memorializing the parties' 2016 Memorandum of Agreement ("MOA"), is far from obvious. *See Apache Powder Co.*, 223 N.L.R.B. 191, 191 (1976) ("[R]escission for unilateral mistake is, for obvious reasons, a carefully guarded remedy reserved for those instances where the mistake is so obvious as to put the other party on notice of an error."). First, the *Company's* attorney himself wrote the disputed 5% 401(k) contribution term into the CBA. *See* Resp. Br. at 7–8. Then, he *highlighted the change by redlining the term* before sending it to the Union's attorney. *See id*. This is perhaps an even worse scenario for violation of the parol evidence rule than not reading—and agreeing to—a term in a contract, a scenario in which we still hold parties to their bargains. *See Paterson v. Reeves*, 304 F.2d 950, 951 (D.C. Cir. 1962) ("One who signs a contract which he had an opportunity to read and understand is bound by its provisions."). The *Company* wrote the term into

the final contract and highlighted it for the Union to review. It strains credulity to then penalize the *Union* for not recognizing an "obvious" mistake in the term amount.

Second, the parties engaged in a full exchange. Neither side suffered from a bargaining disadvantage or mismatched negotiating skills. *See BHM Healthcare Sols., Inc. v. URAC, Inc.*, 320 F. Supp. 3d 1, 10 (D.D.C. 2018). The attorneys for both sides exchanged the final agreement back and forth. The parties have a right to rely on the document to which they both agreed.

Third, courts take the parol evidence rule very seriously, especially in cases of unilateral mistake, a point the majority acknowledges. Op. at 21. But the majority here tautologically uses parol evidence to prove it needs parol evidence. The 2016 MOA is parol evidence. Relying on it to conclude what the final, executed 2017 CBA means is to therefore violate the parol evidence rule. If the 2016 MOA represented the final, negotiated settlement between the parties, as the majority contends, there would have been no need for the Union and the Company to execute the 2017 CBA. The majority claims the MOA is inconsistent with the as-executed CBA including the 5% term, indicating a lack of a meeting of the minds, but the MOA only included placeholder language that the parties would *later* insert the term. *See* J.A. 729 ("The Company agrees to acknowledge the provision of a 401(k) benefit to bargaining union [sic: unit] employees in the drafting of the collective bargaining agreement."). Therefore, the 2016 MOA and the 2017 CBA are just as easily *consistent* with one another.

3

At base, the CBA is the final agreement. We must adhere to the four corners of that document, in which both parties agreed to a 5% 401(k) matching contribution term.

I respectfully dissent.